MICHAEL MADDEN *et al.*, Plaintiffs-Appellants, v. F.H. PASCHEN/S.N. NIELSON, INC., *et al.*, Defendants-Appellees.

First District (6th Division)    No. 1—07—1811

Opinion filed September 30, 2009.

Collison & O'Connor, Ltd., of Chicago, for appellants.

Hinshaw & Culbertson LLP, of Chicago, for appellee Jacobs Facilities, Inc.

Janet R. Davis and Andrew M. Hutchison, both of Meckler, Bulger & Tilson LLP, of Chicago, for appellee Schuler & Shook, Inc.

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Plaintiff Michael Madden, a maintenance worker employed at Amos Alonzo Stagg High School (Stagg High School), was setting up a

projection screen on the stage of the school's theater when he stepped backwards and accidentally fell into the theater's uncovered orchestra pit. He alleged that the resulting nine-foot drop caused him severe injuries that left him permanently disabled.

For the previous four years, the Stagg High School theater had been under construction. Although, at the time of Madden's accident, the school had been issued a temporary occupancy permit for use of the premises, work on the theater had not yet been fully completed. Madden brought a negligence action against general contractor F.H. Paschen/S.N. Nielson, Inc. (Paschen), construction manager Jacobs Facilities, Inc. (Jacobs), architect VOA & Associates (VOA), and the design consultant retained by VOA for that project, Schuler & Shook (Schuler), seeking damages for his injuries. Correspondingly, Madden's wife sought recovery for loss of consortium.

All four defendants moved for summary judgment. The trial court granted summary judgment in favor of defendants Paschen, Schuler, and Jacobs, but denied VOA's motion; the case proceeded to trial against VOA, resulting in a judgment for $1,606,415 in favor of Madden. Meanwhile, Madden dismissed his case against Paschen. He now appeals the trial court's grant of summary judgment in favor of Schuler and Jacobs, and it is only their motions that are now reviewed. For the reasons that follow, we affirm.

## I. BACKGROUND

Madden and his wife, Jean Madden, alleged the following relevant facts in their fourth amended complaint, which now frames the issues before us.

On August 19, 2002, Madden was an employee of Stagg High School, which was a part of Consolidated High School District 230 (District 230). He was engaged in the performance of his duties at the school when he allegedly fell into the orchestra pit in the floor of the school's theater stage, sustaining permanent injuries. At the time, defendants Paschen and Jacobs had contracts with District 230 in connection with the construction of the Stagg High School theater: Paschen as general contractor, and Jacobs as construction manager. In addition, defendant Schuler had a contract with VOA, the architect that District 230 had retained for the theater project, as design consultant in connection with the theater. Madden alleged that all of the defendants retained the right to supervise and control the work, as well as authority to order changes in the work if it was being performed in a dangerous manner and responsibility for on-site safety procedures. Madden further alleged that they were negligent in failing to cover the pit or erect warning signs or barricades around the pit to

prevent injury. He therefore sought monetary damages to compensate him for his injury and his wife for her loss of consortium.

In its motion for summary judgment, Schuler argued that it owed no duty to Madden as a matter of law, because its contractual duties were limited to design consulting, it did not have any responsibility for construction, safety, or other on-site activities, and it did not have any control over the activities of District 230 employees such as Madden. Schuler additionally argued that it could not be found liable on a premises liability theory, because the theater had been turned over to and was being used by District 230 as of the date of Madden's injury.

In support of its motion, Schuler attached a copy of the contract between Schuler and VOA, the architect of the theater project. In the contract, dated July 27, 1999, Schuler agrees to provide consultation services in connection with the construction of a new theater at Stagg High School. With regard to the scope of Schuler's duties, the contract states:

> "2.6.4. The Consultant [Schuler] shall not have control over or charge of and shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work for This Part of the Project, since these are solely the Contractor's responsibility under the Contract for Construction."

The contract also incorporates by reference the terms contained in a professional services proposal sent by Schuler to VOA, which is also attached. That proposal provides that Schuler's design drawings "will be submitted as advisory. These drawings may be used in the final contract drawings only after required engineering, review, and coordination by the project architects and engineers." It further provides:

> "This proposal assumes that VOA Associates and other of its subcontractors will be responsible for the administration, architectural coordination, and electrical, mechanical, and structural engineering for the project. It is understood that as theatre consultants we are not licensed as architects or engineers. We shall endeavor to comply with local codes and requirements in association with the project architects and engineers, but said compliance shall be the responsibility of the project architects and engineers."

Also attached is an additional proposal sent by Schuler to VOA nearly three years later, dated April 15, 2002, in which Schuler proposes to perform additional theater consulting services in connection with an orchestra pit cover for the Stagg High School theater. Schuler's duties are described in the proposal as being limited to preparing contract drawings and specifications, reviewing contractor

submittals, and inspecting the installation of the pit cover. In addition, the proposal states, "All conditions of our existing contract remain in effect and govern this work." (Bill Baike, the Stagg High School building manager, testified in his deposition that this pit cover was not actually installed until at least November 2002, sometime after Madden's accident.)

Schuler also attached the affidavit of Paul Hansen, who identifies himself as the principal in charge of the Higher Education Group at VOA. Hansen states that his duties were to oversee and manage VOA's work for District 230. Hansen stated that in 1999, VOA, working together with Schuler, designed and submitted proposals for a cover to be placed over the orchestra pit when it was not in use. VOA and Jacobs also submitted a cost estimate to District 230 that included the cost of a pit cover for the orchestra pit. However, Hansen said, District 230 rejected VOA and Schuler's pit cover proposals in December 1999 due to cost.

In support of its argument that it had no liability under a premises liability theory, Schuler attached a certificate of substantial completion for the Stagg High School theater project issued by VOA on May 21, 2002, nearly three months before Madden's fall. The certificate states, "Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so the Owner can occupy or utilize the Work for its intended use." The certificate is signed by Al Migon, a VOA project architect; Kenneth Rokos, the construction manager for Jacobs; and representatives from both Paschen and District 230. Schuler further attached a temporary occupancy permit for the theater issued by the Suburban Cook County Regional Office of Education. The permit, dated August 5, 2002, states that the building construction is not complete, but that temporary occupancy will be granted until October 15, 2002.

Jacobs, in its memorandum in support of its motion for summary judgment, argued that it also owed no duty to Madden, as it had no control over the premises, was not in charge of safety on the project, and did not retain control over the means and methods of any project work or any work done by Madden. Jacobs also argued that it owed no duty under a premises liability theory under section 343 of the Restatement (Second) of Torts (Restatement (Second) of Torts §343 (1965)), because, as shall be more fully discussed below, it contended that it was not the possessor of the land. Rather, it alleged that sole possession of the theater area had been handed over to District 230 pursuant to the temporary occupancy permit issued two weeks before Madden's accident occurred.

Jacobs attaches a copy of its written agreement with District 230. This agreement is modified by a "rider," also attached, which states: "The Construction Manager shall allocate responsibility for safety programs among the Contractors without assuming any of the Contractor's duties and responsibilities in that regard."

In addition to the foregoing documents, Jacobs also attaches the deposition testimony of Madden, District 230 director of facilities Robert Hughes, VOA architect Al Migon, and Jacobs superintendent Gerry Meyers.

In his deposition, Madden testified that he worked at Stagg High School as a maintenance man from around 1992 to 2002. He regularly reported to Baike, the Stagg High School building manager, as well as Jerry Framiski, a building supervisor. On the day of the accident, Framiski gave Madden instructions to set up a projection screen on the theater stage in preparation for an Institute Day event that was to take place that evening. When assembled, the screen would be about 12 feet by 20 feet and images would be projected onto it from the back of the theater. Madden stated that he did not have any dealings with any employees of the architect or anyone dealing with construction on that day. At around 5 in the evening, Madden said, he went to the theater. The doors at the back of the theater had been left open, he said, because he had not been issued keys for that area. The head of the Stagg High School library had previously left the screen on the stage for Madden to set up.

Madden said that it was while setting up the projection screen on the theater stage that he fell into the orchestra pit. "Everything blended in together," he stated. "The orchestra pit was black and so was the stage, was flat black; and with the lights on it, it all looked the same." However, when asked if he was aware of the orchestra pit at the time, Madden answered, "I had to know the pit was there. *** But at the time when I was doing it, you know, I was doing a job, and I was setting up the screen, and I thought everything was going right until I turned the screen on the diamond, and it got longer, and down I went."

Madden testified that he was aware that the theater area was under construction but only "occasionally" went into that area if he was instructed to do so by Baike, the Stagg High School building manager. He also stated that he had no dealings with the construction manager that he could recall, and he had only minimal dealings with the contractors, for instance, lending the workers a shovel or a broom. In addition, he stated that he had never heard of Schuler.

Madden further stated that he was aware of two incidents prior to his accident where people had fallen into the orchestra pit. The first

incident involved an employee for one of the contractors. Madden and a fellow maintenance man for the school were on break when they heard that the employee had fallen in, and they both said, "this is never going to happen to either one of us." The second incident involved a student.

Robert Hughes, the director of facilities for District 230, testified that the Institute Day event for which Madden was setting up the projector screen was an annual event that would take place before the start of the school year. The purpose of the event was for the superintendent of schools and the principals to discuss their plans for the upcoming year with the administrators, teachers, and building staff. He stated that the preparations made for the August 19, 2002, Institute Day event in the theater were all made by District 230. He also testified that he believed the temporary occupancy permit issued to the district in August 2002 granted it possession of the theater "on a temporary basis," although he did not believe that the district would have full control until it was issued a permanent permit. In the days leading up to the Institute Day event, he said, there were still punch lists of uncompleted tasks: "[T]here was all kinds of miscellaneous things, repairs that were being done, not just cosmetic."

While the construction was ongoing, Hughes stated, he attended weekly construction meetings with representatives from VOA, Paschen, and Jacobs. Safety issues were not normally brought up at these meetings, he said, although if a special item of safety came up, it might be addressed. Prior to each meeting, he would typically walk through the jobsite with the construction site superintendent who worked for Jacobs and talk about issues that were likely to come up at the meeting. When asked about Jacobs' role with respect to safety procedures, Hughes gave the following testimony:

"MR. O'CONNOR [counsel for Madden]: If you had been made aware by Jacobs back in May of 2002 that there was a safety issue concerning fall protection over the orchestra pit area, what would you have done about it?

HUGHES: I would have asked them what they're doing to reconcile it.

Q. And would you have relied on their recommendations then at that point?

A. Yes.

Q. And if they at that point expressed to you that that area shouldn't be used without a pit cover or some kind of barricade, would you have complied with that?

A. We would have looked into it."

Hughes also testified that in 2002, District 230 was looking into the possibility of installing a pit cover in order to increase the available space on stage. Hughes contacted Migon, the VOA project architect, who in turn contacted Schuler, which came up with a list of vendors that the District could contact for the project. District 230 then made the decision to hire a vendor known as SECOA to install a pit cover. SECOA contracted directly with the district, he said, and the pit cover never became a part of the contract documents that Jacobs or VOA had with the district.

Hughes further testified that Madden would only take orders from a representative of the district and that, on the day of his accident, regarding the work he was doing in the theater, all the tools he used would have been his or provided to him by the district, not by Jacobs.

Gerry Meyers testified that he was hired by Jacobs as a superintendent for the District 230 project. He worked there for three years before leaving on September 26, 2002. He stated that during his work with Jacobs, he would walk the jobsite daily, and he ran weekly meetings with representatives from VOA, Paschen, and the school. However, he said, District 230 director of facilities Hughes retained authority over safety; Jacobs did not have enforcement power over safety matters. Furthermore, Meyers said, in the summer of 2002, the theater was turned over to the school, and past that point, he could not recall any further work on punch list items being done in the theater, which he characterized as "just about done." Additionally, the school changed the keys to the theater area in the spring of 2002, although Meyers retained a master key.

Migon, a VOA project architect assigned to the Stagg High School project, testified that VOA was responsible for ensuring compliance with safety codes: if a property owner told VOA to do something that did not conform to the codes, he said, VOA would have to advise the owner of that fact, and VOA would not allow them to use designs that were not code-compliant.

Regarding on-site procedures, Migon testified that Jacobs did all the scheduling of the work, coordinating the various contractors on the jobsite. He offered the following testimony about Jacobs' involvement in safety matters:

"MR. O'CONNOR [counsel for Madden]: If something—if Jacobs had the opinion that something you designed didn't meet up with a certain [safety] code, would they bring that to your attention?

MIGON: I would hope so.

Q. You would expect them to?

A. I'm not saying that we would expect them to, but if they did, you know, I would hope they would."

He further stated that Schuler had no responsibility for safety on the jobsite.

Regarding the certificate of substantial completion issued by VOA prior to Madden's fall, Migon stated that such a certificate is a statement by VOA that "the work is complete to the point where the owner can use it for its intended purpose." VOA alone made the decision to issue the certificate, he said, and he was unsure why other parties needed to sign off on it. As was standard VOA practice, Migon said, when he issued the certificate, he attached a punch list of tasks that needed to be done before the project would be fully complete. He stated that Jacobs, as the construction manager, could also have attached its own punch list items. He explained that while a construction manager does not perform the actual work, it supervises the construction, and part of that supervisory duty would be to add a punch list item if it observed a part of the work that had not yet been completed.

Migon further testified that in 2002, District 230 sent word to VOA that it wanted to purchase a cover for the orchestra pit. He described Schuler's role in the process as limited to the following: First, Schuler would provide the design specifications for the pit cover. Once the district decided on a manufacturer for the pit cover, Schuler would review the shop drawings produced by that manufacturer. In addition, when the pit cover was eventually installed, Schuler would do a site visit and come up with a punch list of tasks that still needed completion.

In response to defendants' motions for summary judgment, Madden filed a statement of additional facts. Included in that statement was the deposition testimony of Elaine Fitzgerald, a VOA project architect. Fitzgerald testified that VOA hired Schuler during the design phase of the Stagg High School project as a design consultant. According to her, Schuler's duty "was to do what a consultant does, which is give us their expertise on a particular subject, being the acoustics, lighting, and everything that would pertain to a theater." Thus, she said, Schuler would make general recommendations on how things should be built, and VOA, as the architect, would try to implement those recommendations in its designs. She stated that making sure the designs complied with safety codes was a "group effort" between VOA and Schuler.

Fitzgerald testified that the possibility of a pit cover was discussed at the weekly construction meetings, although she did not recall whether there had been a discussion about Paschen subcontracting out that particular job. She stated that Schuler's job with respect to a pit cover would have been to make recommendations on it and come

up with a pricing estimate, but the actual cost would be determined by the party eventually hired to build the pit cover, not Schuler.

Madden's statement of additional facts also included an affidavit by Leonard Wisniewski, who stated that he was a licensed registered architect. Based upon his review of discovery material and construction documents, he opined that the uncovered orchestra pit was a violation of accepted industry safety practices as well as applicable safety codes. Madden additionally attached an affidavit by Dennis Puchalski, a construction safety consultant, who rendered the exact same opinion as Wisniewski regarding the orchestra pit.

In addition, Madden included an affidavit by Kenneth Rokos, who identified himself as the construction manager for Jacobs at the Stagg High School project. As shall be discussed in more detail below, Rokos asserted that Jacobs had an expanded role in on-site safety procedures as well as an active presence in theater construction up to the time of Madden's accident.

Jacobs subsequently filed a motion for a protective order barring Madden from any further contact with Rokos, contending that Madden's *ex parte* contact with Rokos was in violation of both the discovery rules and the rules of professional conduct. On November 22, 2006, the trial court granted Jacobs' motion. The trial court directed Jacobs to file a motion regarding the existing Rokos affidavit and specified that the protective order would last until it had ruled upon Jacobs' motion. Accordingly, on November 30, 2006, Jacobs filed a motion to strike the Rokos affidavit. It contended that the affidavit would be inadmissible in evidence under Illinois Supreme Court Rule 191(a) (210 Ill. 2d R. 191(a)) on the grounds that the statements and opinions therein were conclusory and lacked foundation showing that they were based on personal knowledge. It further contended that the affidavit was obtained without conforming to the notice requirements of Illinois Supreme Court Rule 206(a) (188 Ill. 2d R. 206(a)) and was therefore obtained in violation of the Illinois Rules of Professional Conduct, which prohibit an attorney from making *ex parte* contact with a party that he knows to be represented by counsel except through channels authorized by law. Although Rokos was not personally a party to the lawsuit, Jacobs argued that Rokos was considered part of the corporate client for contact purposes because his position as construction manager made him a member of Jacobs' control group under *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 89 Ill. 2d 103, 432 N.E.2d 250 (1982).

On March 26, 2007, the trial court granted the summary judgment motions of Schuler and Jacobs (as well as the summary judgment motion of Paschen), but it denied the summary judgment motion

of VOA. The court rejected Madden's premises liability theory with respect to all defendants, finding that District 230 was the party in possession of the theater at the time of Madden's accident, due to the issuance of the temporary occupancy permit. The court also rejected Madden's vicarious liability theory, finding that Madden was an employee of Stagg High School rather than an employee of defendants, and defendants had no control over the means and methods of his work. On Madden's direct liability theory, the court found that Jacobs could not be held liable, because "Jacobs' contract provision in the rider makes them not in charge of safety." Likewise, said the court, Schuler "had no contractual duty with regard to worker safety"; as a design consultant, it did not install the pit, it had no control over construction, and it had no duty to ensure compliance with safety codes. With respect to VOA, however, the court found that a material issue of fact existed as to whether it could be held liable for negligent design code violations, because, unlike Schuler and Jacobs, it had a contractual duty to ensure safety code compliance, and yet it issued the certificate of substantial completion while the pit was still lacking a cover, which affiants Puchalski and Wisniewski stated was a code violation.

Additionally, pursuant to Jacobs' motion to strike, the trial court struck certain portions of the Rokos affidavit for lack of compliance with Rule 191(a) (210 Ill. 2d R. 191(a)), stating that those portions were conclusory and lacked foundation to establish Rokos' personal knowledge. (The exact statements that were stricken, along with the exact reasons given by the trial court for striking them, shall be discussed below.) The court did not rule on Jacobs' contention that Madden's discovery attempts had been improper. The court further issued an order lifting the protective order around Rokos.

On April 4, 2007, Madden filed a motion for reconsideration and clarification of the court's March 6, 2007, order. Madden stated that after the trial court lifted the protective order around Rokos, Madden obtained an evidence deposition from him. He contended that the trial court's grant of summary judgment was improper in light of the information contained in this deposition. He further argued that he could not have obtained the evidence deposition sooner, due to the protective order around Rokos.

The trial court denied Madden's motion for reconsideration on June 1, 2007. It found that Madden had ample opportunity to take an evidence deposition from Rokos before the protective order was entered. It stated that Rokos' name was mentioned in another deposition in December 2005, and from that time until the protective order was entered on November 22, 2006, Madden was under no court order

preventing him from speaking with or deposing Rokos. The court characterized Madden's decision to take his affidavit rather than taking a deposition from him as trial tactics. Therefore, the court found that the material contained in Rokos' evidence deposition did not count as newly discovered evidence and was not proper grounds for reconsideration.

## II. ANALYSIS

On appeal, Madden contends that the trial court erred in granting summary judgment because material issues of fact existed with respect to three issues: (1) whether Schuler and Jacobs can be held liable on a premises liability theory, which would necessitate their being in possession of the theater at the time of the accident; (2) whether they can be held liable by virtue of the fact that they created a dangerous condition in the theater; and (3) whether they can be held liable on the basis of the supervisory control they allegedly exercised over the ongoing work in the theater. In this regard, Madden contends that the trial court erred in striking portions of the Rokos affidavit and in declining to consider Rokos' evidence deposition in connection with its motion for reconsideration. We discuss these contentions in turn.

### A. Premises Liability

Madden first argues that a material issue of fact exists as to whether Schuler and Jacobs owed a duty of care to him under a premises liability theory, pursuant to section 343 of the Restatement (Second) of Torts. Restatement (Second) of Torts §343 (1965). Schuler and Jacobs challenge Madden's contention of premises liability on four grounds. First, they argue that, regardless of the issue of possession, their duties are strictly limited by the scope of their contracts, which do not impose any responsibility for safety matters. Second, they argue that they were not possessors of the theater within the meaning of section 343. Third, they argue that Madden was not their invitee. Finally, they argue that even if they were possessors of the theater and Madden were their invitee, they still owed Madden no duty, because the pit was an open and obvious danger. We address the question of possession first, as we find it to be dispositive of this issue.

We review the trial court's entry of summary judgment *de novo*. *General Casualty Insurance Co. v. Lacey*, 199 Ill. 2d 281, 284, 769 N.E.2d 18, 20 (2002). Summary judgment is appropriate if, "when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *General Casualty Insurance*, 199 Ill. 2d at 284, 769 N.E.2d at 20, citing 735 ILCS 5/2—1005(c)

(West 2006). It should only be granted where the movant's right to judgment is clear and free from doubt. *Reed v. Bascon*, 124 Ill. 2d 386, 393, 530 N.E.2d 417, 420 (1988). Accordingly, the evidence should be construed strictly against the movant (*Reed*, 124 Ill. 2d at 393, 530 N.E.2d at 420), and where fair-minded persons could draw different inferences from the facts, summary judgment should not be granted (*In re Estate of Roeseler*, 287 Ill. App. 3d 1003, 1013, 679 N.E.2d 393, 401 (1997)).

■ It is a well-established principle in tort law that possessors of land owe certain duties to those on their land. See W. Keeton, Prosser & Keeton on Torts §57, at 386 (5th ed. 1984). Section 343 of the Restatement (Second) of Torts has codified part of this duty as follows:

> "A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger." Restatement (Second) of Torts §343, at 215-16 (1965).

See *Deibert v. Bauer Brothers Construction Co.*, 141 Ill. 2d 430, 434, 566 N.E.2d 239, 241 (1990) (section 343 adopted in Illinois).

It is a prerequisite to liability under section 343 that defendant be a possessor of land. The term "possessor" with respect to possession of land is defined in the Restatement as "a person who is in occupation of the land with intent to control it." Restatement (Second) of Torts §328E, at 170 (1965); see *Esser v. McIntyre*, 169 Ill. 2d 292, 302, 661 N.E.2d 1138, 1143 (1996) (defendant not subject to premises liability where he did not "occupy land with the intent to control it"); *Simpson v. Byron Dragway, Inc.*, 210 Ill. App. 3d 639, 646, 569 N.E.2d 579, 583 (1991) (defendant race car association not subject to premises liability for race car driver's death when it did not own or control the race track in question). This emphasis on control is in keeping with the reason behind imposing premises liability, namely, that "the person in possession of property ordinarily is in the best position to discover and control its dangers, and often is responsible for creating them in the first place." W. Keeton, Prosser & Keeton on Torts §57, at 386 (5th ed. 1984). The notion of control is refined in the Restatement of Property, which defines a possessory interest in land, in relevant part, as follows:

"a physical relation to the land of a kind which gives a certain degree of physical control over the land, and an intent so to exercise such control as to exclude other members of society in general from any present occupation of the land." Restatement of Property §7, at 19 (1936).

See also W. Keeton, Prosser & Keeton on Torts §63, at 444 (5th ed. 1984) (typical powers associated with control over land are "power to exclude any one, or to direct the use of the land").

■ In this case, neither Schuler nor Jacobs qualifies as being "in occupation of land with intent to control it" (Restatement (Second) of Torts §328E (1965)) at the time of Madden's accident so as to subject either to potential liability under section 343. As design consultant, Schuler had no contractual power to direct events on the jobsite, nor did it have the power to exclude others from that site. Rather, Schuler's contract with VOA states that Schuler "shall not have control over or charge of and shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs." This is corroborated by the deposition testimony of VOA architect Migon, who stated that Schuler had no responsibility for jobsite safety. Madden points out that Schuler stated that it would "endeavor to comply with local codes and requirements," but neglects to mention that in the same sentence, Schuler stipulates that "said compliance shall be the responsibility of the project architects and engineers."

Moreover, as for Jacobs, and for Schuler as well, we need not reach the issue of whether they ever had control over the theater in their respective roles as construction manager and design consultant, because the record shows that they handed over any such control they might have had pursuant to the temporary occupancy permit allowing the school to use the theater area. Hughes, the director of facilities for District 230, testified in his deposition that this permit gave temporary possession to the district. The district demonstrated this control over the theater after it had taken possession by preparing it for its Institute Day activities, as reflected in Hughes' testimony. There is no evidence in the record that would tend to indicate that either Schuler or Jacobs had any control over, or any hand in, those preparations.

In this regard, the instant case is similar to *Kotecki v. Walsh Construction Co.*, 333 Ill. App. 3d 583, 776 N.E.2d 774 (2002), where the court found that a general contractor could not be held liable on a premises liability theory because it had already relinquished control of the property to the owner. The *Kotecki* plaintiff was a painter employed by a subcontractor who was hired as part of a construction project for a Home Depot store. *Kotecki*, 333 Ill. App. 3d at 585, 776 N.E.2d at

775. He sustained injury when he lost his footing as he stepped off a ladder and brought suit against the general contractor. *Kotecki*, 333 Ill. App. 3d at 585, 776 N.E.2d at 775. At the time, construction was substantially complete, and the general contractor had turned the building over to Home Depot, although there was still a punch list of tasks that remained to be completed (including the painting job where plaintiff sustained his injury). *Kotecki*, 333 Ill. App. 3d at 585, 776 N.E.2d at 775. Under these facts, the *Kotecki* court found that the general contractor was not a possessor of the land; rather, "only Home Depot possessed and controlled the property on which plaintiff was injured." *Kotecki*, 333 Ill. App. 3d at 589, 776 N.E.2d at 779. Likewise, the issuance of the temporary occupancy permit shows that Jacobs had given up possession of the land, if indeed such possession existed in the first place. Just as the existence of punch list items remaining to be completed was insufficient for a finding of possession in *Kotecki*, so it is here as well.

Madden cites a number of cases where a defendant contractor was found to be in possession of a construction site at which a worker was injured. However, the cases he cites are inapposite because they all involve active construction sites at which possession of the premises was undisputed.

For instance, in *Deibert*, 141 Ill. 2d 430, 566 N.E.2d 239 (1990), the plaintiff worker brought suit against the general contractor on his jobsite for injuries sustained when he tripped in a rut in the ground after exiting a portable bathroom. At the time he exited the bathroom, he was looking up and not down to check whether workers were throwing construction debris off a balcony above and near the bathroom, as they had done in the past. *Deibert*, 141 Ill. 2d at 433, 566 N.E.2d at 240. The defendant had control over the site, as evidenced by the fact that it could have moved the portable bathroom to a safer location or instructed the workers not to throw debris off the balcony. *Deibert*, 141 Ill. 2d at 441-42, 566 N.E.2d at 244. Moreover, the defendant does not seem to have disputed the issue of possession. Accordingly, the court found that defendant was a possessor of the property. *Deibert*, 141 Ill. 2d at 438, 566 N.E.2d at 243.

The other cases cited by Madden on this matter are likewise distinguishable. *Clifford v. Wharton Business Group, L.L.C.*, 353 Ill. App. 3d 34, 40, 817 N.E.2d 1207, 1213 (2004), and *Ralls v. Village of Glendale*, 233 Ill. App. 3d 147, 598 N.E.2d 337 (1992), both involved the liability of a general contractor on a jobsite where work was ongoing and control had not been returned to the owner of the property. In *Clifford*, plaintiff was a carpenter working at the jobsite who was allegedly injured when a newly built wall collapsed on top of him, caus-

ing him to fall into a stairwell opening in the floor. *Clifford*, 353 Ill. App. 3d at 37, 817 N.E.2d at 1210. In *Ralls*, plaintiff was a foreman who slipped and fell on an icy slope in the course of his work. *Ralls*, 233 Ill. App. 3d at 150, 598 N.E.2d at 341. For the reasons discussed above, the instant case is less akin to these cases and more akin to *Kotecki* regarding defendants' control over the jobsite at the time of Madden's accident.

### B. Liability Due to Creation of a Dangerous Condition

Madden next argues that, even if Schuler and Jacobs are not subject to premises liability due to lack of possession under section 343, they are nevertheless liable for his injury under section 385 as parties who created a dangerous condition, namely, the uncovered orchestra pit. Schuler and Jacobs, on the other hand, contend that the undisputed facts show that they did not actually create the condition, so they cannot be held liable under this section.

It is well established in Illinois that a defendant who creates a dangerous condition on land on behalf of the possessor can be held liable for injuries caused to third parties, even if defendant is not himself an owner or possessor of the land. *Corcoran v. Village of Libertyville*, 73 Ill. 2d 316, 324, 383 N.E.2d 177, 179 (1978). Section 385 describes the scope of this liability as follows:

> "One who on behalf of the possessor of land erects a structure or creates any other condition thereon is subject to liability to others upon or outside of the land for physical harm caused to them by the dangerous character of the structure or condition after his work has been accepted by the possessor, under the same rules as those determining the liability of one who as manufacturer or independent contractor makes a chattel for the use of others." Restatement (Second) of Torts §385, at 293 (1965).

See *Johnson v. Equipment Specialists, Inc.*, 58 Ill. App. 3d 133, 139, 373 N.E.2d 837, 841-42 (1978) (adopting section 385 in Illinois). The rationale behind this rule is as follows:

> "When a building is designed and built, it is foreseeable that it will not be changed in a material manner for some time to come. It is foreseeable that contractees will not install safety features that designers have omitted. An underlying purpose of tort law is to provide for public safety through deterrence of negligent designers and builders. This purpose cannot be accomplished if these persons are insulated from liability simply by the act of delivery to the contractee. The purpose can be accomplished if the issue is treated as one of proximate cause. At the same time, designers and builders will be free of liability where a jury finds that the contractee's or plaintiff's negligence, and not they, caused the injury." *Johnson*, 58 Ill. App. 3d at 140-41, 373 N.E.2d at 843.

In *Johnson*, a farm worker was fatally injured when he fell through an opening in a grain bin. *Johnson*, 58 Ill. App. 3d at 137-38, 373 N.E.2d at 840. The court found that defendant Equipment Specialists, Incorporated, which had both designed and constructed the bin, could be held liable for his death. *Johnson*, 58 Ill. App. 3d at 141, 373 N.E.2d at 843. The court reasoned that the unguarded opening was "imminently dangerous in kind," so that it was reasonable to place liability upon the party that had created that dangerous condition. *Johnson*, 58 Ill. App. 3d at 141, 373 N.E.2d at 843. Similarly, in *Corcoran*, 73 Ill. 2d at 324, 383 N.E.2d at 179, parents of a child who was injured when he fell into a ditch brought suit against the village that owned the ditch and the county that had been responsible for maintaining the ditch. Specifically, with regard to the county, the parents alleged that the county had caused the ditch to become hazardous by filling in a portion of it. *Corcoran*, 73 Ill. 2d at 324, 383 N.E.2d at 179. The court found that the county could not escape liability due to the fact that it was not the owner of the subject property, but rather that the liability of the village and the county was "coextensive," due to the county's status as a creator of an allegedly dangerous condition. *Corcoran*, 73 Ill. 2d at 325, 383 N.E.2d at 179.

▪ However, section 385 does not apply to the present case, and *Johnson* and *Corcoran* are distinguishable, because it cannot be said that defendants created the dangerous condition on the land that caused Madden's injury; thus, neither defendant is a party who "erects a structure or creates any other condition thereon" within the meaning of section 385. Restatement (Second) of Torts §385 (1965). The record shows that Schuler, unlike the *Johnson* defendant, was merely a design consultant with no binding decisional power over whether or not appropriate safety measures were taken with respect to the pit. Similarly, the evidence shows that Jacobs was not responsible for the design or the construction of the orchestra pit. As construction manager, it coordinated the schedules of the various subcontractors on the job, but it was not in charge of actually erecting the structure at issue. Thus, the present case is unlike *Johnson*, in which the defendant's negligence in design and subsequent implementation of that negligent design is what caused the worker's injury. *Johnson*, 58 Ill. App. 3d at 141, 373 N.E.2d at 843. It is also unlike *Corcoran*, where the plaintiffs' allegations of negligence were premised upon the fact that the county actively caused the dangerous condition of the ditch. *Corcoran*, 73 Ill. 2d at 324, 383 N.E.2d at 179.

In addition, Schuler and Jacobs had no decisional power with respect to the pit. It was the district that originally decided that a pit cover was unnecessary. Indeed, VOA employee Hansen stated in his af-

fidavit that Schuler and Jacobs had originally helped design pit cover proposals, but District 230 rejected those proposals due to cost. When the district subsequently decided to install a cover over the orchestra pit, it decided to hire an independent contractor to perform that job, rather than place responsibility with either of the defendants. Schuler's role was limited to preparing designs, reviewing submissions from contractors, and then inspecting the finished product, according to the deposition testimony of Hughes as well as Schuler's correspondence with VOA. Thus, neither Schuler nor Jacobs stands in the position of the *Johnson* defendant, whose design and construction decisions are what led to the injury-causing condition. The uncontroverted evidence shows that District 230 had its hands on the reins throughout, such that the original decision not to implement a pit cover, as well as the subsequent decision to implement a pit cover and the execution of that decision, was out of defendants' hands. Schuler and Jacobs therefore cannot properly be held liable under section 385.

### C. Liability Due to Retained Control

Madden further argues that Schuler and Jacobs retained sufficient control over safety measures to incur liability under section 414, which imposes a duty of care upon defendants who have exercised sufficient control over an independent contractor's work. Schuler and Jacobs, on the other hand, contend that they incurred no such duty, as they lacked general supervisory control over the theater at the time of Madden's accident, let alone control over the means and methods of the work being performed at the time. We find that, under the undisputed facts, Schuler and Jacobs did not have the requisite control for liability under this section.

In general, one who entrusts work to an independent contractor is not liable for the acts or omissions of the independent contractor. *Calderon v. Residential Homes of America, Inc.*, 381 Ill. App. 3d 333, 340, 885 N.E.2d 1138, 1145 (2008). However, section 414 provides what is known as the "retained control exception" to this general rule:

> "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts §414, at 387 (1965).

See *Calderon*, 381 Ill. App. 3d at 340, 885 N.E.2d at 1145 (section 414 adopted in Illinois); *Clifford*, 353 Ill. App. 3d at 41, 817 N.E.2d at 1214 (sections 343 and 414 provide independent bases for recovery). This section provides for both vicarious and direct liability, depending on

the degree of control that the defendant retains over its independent contractor. As explained in comment *a*:

"If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant. The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others." Restatement (Second) of Torts §414, Comment *a*, at 387 (1965).

Thus, under this section, "the general contractor, by retaining control over the operative details of its subcontractor's work, may become vicariously liable for the subcontractor's negligence; alternatively, even in the absence of such control, the general contractor may be directly liable for not exercising his supervisory control with reasonable care." *Cochran v. George Sollitt Construction Co.*, 358 Ill. App. 3d 865, 876-77, 832 N.E.2d 355, 363-64 (2005); see *Calderon*, 381 Ill. App. 3d at 341, 885 N.E.2d at 1145 (discussing the bifurcated analysis for vicarious and direct liability under section 414).

Accordingly, we proceed to discuss Madden's contention that defendants are subject to both vicarious and direct liability under section 414 based on the control they retained over the construction of the Stagg High School theater.

Vicarious liability is, by definition, derivative; that is, it is based upon the tortious conduct of another. See Black's Law Dictionary 934 (8th ed. 2004) (defining vicarious liability as "[l]iability that a supervisory party (such as an employer) bears for the actionable conduct of a subordinate or associate (such as an employee) based on the relationship between the two parties"). As stated above, the general rule is that a party who entrusts work to an independent contractor will not be held vicariously liable for the tortious acts or omissions of that independent contractor. *Cochran*, 358 Ill. App. 3d at 873, 832 N.E.2d at 361; *Calderon*, 381 Ill. App. 3d at 340, 885 N.E.2d at 1145. This is because one who hires an independent contractor usually does not supervise the details of the contractor's work and is therefore not in a good position to prevent the contractor from acting negligently. *Calderon*, 381 Ill. App. 3d at 340, 885 N.E.2d at 1145.

However, if sufficient control is exercised over the independent contractor, then the rationale behind this general rule is no longer sound. Thus, the retained control exception contained in section 414, as interpreted in *Cochran*, provides that a defendant becomes subject to vicarious liability for the negligence of its subcontractor "by retaining control over the operative details of its subcontractor's work." *Cochran*, 358 Ill. App. 3d at 877, 832 N.E.2d at 363. The mere existence of a safety program, safety manual, or safety director is insufficient to trigger this exception. *Cochran*, 358 Ill. App. 3d at 876, 832 N.E.2d at 363, citing *Martens v. MCL Construction Corp.*, 347 Ill. App. 3d 303, 318-19, 807 N.E.2d 480, 492 (2004). Rather, "[t]here must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts §414, Comment *c*, at 388 (1965); see *Shaughnessy v. Skender Construction Co.*, 342 Ill. App. 3d 730, 737-38, 794 N.E.2d 937, 942 (2003) (general contractor could not be held vicariously liable for subcontractor's actions where it had a general right to inspect the subcontractor's work but did not control the way in which the subcontractor's employees carried out their jobs).

■ In this case, defendants may not be found vicariously liable under section 414 because neither of them qualify as "[o]ne who entrusts work to an independent contractor" (Restatement (Second) of Torts §414, at 387 (1965)), which is a necessary precondition to being vicariously liable under this section for the tortious acts of that independent contractor. See *Connaghan v. Caplice*, 325 Ill. App. 3d 245, 249, 757 N.E.2d 971, 975 (2001) (stating that "[t]he theory of recovery expressed in section 414 is based upon a master/servant relationship or *respondeat superior*"); *Cochran*, 358 Ill. App. 3d at 873, 832 N.E.2d at 363 (scope of section 414 extends to "the duty of those who employ independent contractors"); *Martens*, 347 Ill. App. 3d at 318, 807 N.E.2d at 492 (central issue under section 414 "is retained control of the *independent contractor's* work" (emphasis added)).[1] Thus, Schuler and Jacobs are not vicariously responsible for any alleged negligence committed by Stagg High School or District 230, as there is no evidence suggesting that either of these entities could be considered an independent contractor of defendants. On the contrary,

---

[1]Jacobs suggests in its brief that it cannot be held vicariously liable for Madden's injuries because Madden himself was not its independent contractor. This argument is flawed, as section 414 does not contemplate an employer's duty to its independent contractor but rather an employer's duty to others based on the actions of its independent contractor. *Connaghan*, 325 Ill. App. 3d at 249, 757 N.E.2d at 975.

Jacobs was employed by the district, while Schuler was employed by VOA, which was also employed by the district.

Moreover, even setting aside the lack of a master-servant relationship, there is no evidence that Schuler and Jacobs exerted any form of control over Stagg High School or the district with respect to Madden's work, let alone sufficient control to subject them to vicarious liability for these entities' actions under section 414. Madden's situation in this regard is analogous to that of the plaintiff in *Kotecki*, 333 Ill. App. 3d at 587, 776 N.E.2d at 777, where the court found that the defendant general contractor owed no duty of care under section 414 to the plaintiff due to insufficient control over the plaintiff's work. In *Kotecki*, the plaintiff admitted in deposition testimony that his employer alone controlled the manner in which he completed his work; the employer coordinated the work, gave him his assignments, and provided him with all of his materials. *Kotecki*, 333 Ill. App. 3d at 587, 776 N.E.2d at 777. The general contractor did not have authority to tell him how to complete his job. *Kotecki*, 333 Ill. App. 3d at 587, 776 N.E.2d at 777; see also *Rangel v. Brookhaven Constructors, Inc.*, 307 Ill. App. 3d 835, 839, 719 N.E.2d 174, 177-78 (1989) (general contractor could not be found vicariously liable where it was subcontractor who was responsible for directing injured worker's actions); *Shaughnessy*, 342 Ill. App. 3d at 738, 794 N.E.2d at 942 (no vicarious liability for general contractor who did not control manner of injured worker's job performance). Likewise, Madden stated in his deposition that he was instructed to assemble the screen on the theater stage by Framiski, the building supervisor for Stagg High School. He had no contact with anyone involved with construction on the day of his accident, and indeed, he stated that he had minimal contact with the constructors and was not even aware of what Schuler was. Accordingly, even if the school were to have committed negligence in its handling of Madden's job, defendants could not be held vicariously liable for it.

Madden further argues that defendants may be held vicariously liable for the alleged negligence of the subcontractors in failing to take adequate safety precautions with regard to the orchestra pit. We disagree. Schuler's job as design consultant, by its very nature, would not entail hiring or entrusting work to any subcontractors, nor is any evidence to the contrary proffered. Moreover, Schuler did not retain control over the subcontractors' jobsite activities, let alone control to such a degree that any subcontractor was "not entirely free to do the work in his own way" (Restatement (Second) of Torts §414, Comment *c*, at 388 (1965)). In point of fact, Schuler's contract with VOA, as discussed above, specifically eschews any responsibility for on-site

procedures or safety precautions. See *Calderon*, 381 Ill. App. 3d at 343, 885 N.E.2d at 1147 (in general, " '[t]he best indicator of whether a contractor has retained control over the subcontractor's work is the parties' contract, if one exists' "), quoting *Joyce v. Mastri*, 371 Ill. App. 3d 64, 74, 861 N.E.2d 1102, 1110 (2007); *Winters v. Fru-Con Inc.*, 498 F.3d 734, 746 (7th Cir. 2007) (defendant not liable for plaintiff worker's injury where the injury occurred outside of defendant's duty as established by its contract with plaintiff's employer). This is corroborated by the testimony of VOA project architect Migon, who stated in his deposition that Schuler had no responsibility over safety. Accordingly, Schuler cannot be held vicariously liable for any negligence that might have been committed by the subcontractors.

Furthermore, as for Jacobs, the rider provision in Jacobs' contract with District 230 states that Jacobs "shall allocate responsibility for safety programs among the Contractors without assuming any of the Contractor's duties and responsibilities in that regard." As with Schuler, this contractual provision is evidence of Jacobs' lack of retained control. See *Calderon*, 381 Ill. App. 3d at 343, 885 N.E.2d at 1147; *Joyce*, 371 Ill. App. 3d at 74, 861 N.E.2d at 1110. Moreover, even aside from this contractual provision, and even assuming *arguendo* that Jacobs may have had a certain level of control over the subcontractors on the jobsite, the record does not reflect that any such theoretical control would have extended to the period of time during which the school had taken possession of the theater pursuant to the temporary occupancy permit—that is, the crucial period of time where Madden's accident is concerned. See *Winters*, 498 F.3d at 746 (no liability for defendant where plaintiff's injury occurred after defendant's active duty with respect to the apparatus that injured plaintiff had ended); *Kotecki*, 333 Ill. App. 3d at 587, 776 N.E.2d at 777. Indeed, in his deposition, Jacobs superintendent Meyers agreed with the interrogating counsel's statement that construction work was "finished up" in the theater area in May 2002 to an extent where Jacobs did not conduct walkthroughs of that area for the entirety of the summer. Madden argues that the theater was not yet fully complete and that after Institute Day, Jacobs later returned to the theater to complete the unfinished punch list items; however, this does not serve to establish the necessary control for purposes of Institute Day.

Madden additionally argues that, even to the extent that defendants may have exercised insufficient control to be vicariously liable under section 414, they may still be found directly liable under section 414, as their failure to "exercise[ ] [their] supervisory control with reasonable care" (Restatement (Second) of Torts §414, Comment *a*, at 387 (1965)) contributed to Madden's injury. He further argues that

there is liability pursuant to comment *b* to section 414, which states that a defendant is subject to direct liability if "he knows or should know that the subcontractors have carelessly done their work in such a way as to create a dangerous condition, and fails to exercise reasonable care either to remedy it himself or by the exercise of his control cause the subcontractor to do so." Restatement (Second) of Torts §414, Comment *b*, at 387 (1965); see *Cochran*, 358 Ill. App. 3d at 879, 832 N.E.2d at 365 (discussing the lesser required level of control for direct liability under section 414). We disagree.

The record shows that neither defendant had contact with Madden on the night of his accident, and there is no evidence that they knew or could have known that he would be setting up a screen in the theater, let alone his dangerous proximity to the pit while performing the action, or that they retained any control that would enable them to prevent him from carrying on this action in such a dangerous manner. In this regard, this case is analogous to *Cochran*, 358 Ill. App. 3d at 880, 832 N.E.2d at 365, where the court applied comment *b* to section 414 to find that the defendant contractor could not be held liable when a plaintiff worker was injured due to an unsafe ladder setup, since there was no evidence that the defendant was aware or should have been aware of that unsafe ladder setup. Just as the *Cochran* defendant lacked knowledge, actual or constructive, of the dangerous way in which plaintiff was performing his work, so too did Jacobs lack knowledge of Madden's activities on the night of his accident. See also *Shaugnessy*, 342 Ill. App. 3d at 740, 794 N.E.2d at 942 (no liability for defendants where "there was no evidence that [defendants] knew or had notice of the hazardous method plaintiff employed" in performing the activity that caused his injury); *Rangel*, 307 Ill. App. 3d at 839, 719 N.E.2d at 177-78.

Madden nevertheless argues that defendants should have exercised their supervisory control to prevent there having been an uncovered pit in the first place. However, as has been discussed, the defendants lacked decisional power with respect to the pit. It was District 230's decision not to implement a pit cover in the first instance. In addition, the uncontroverted evidence shows that Schuler, as a mere design consultant, lacked any sort of supervisory control, contractual or otherwise, over jobsite safety. Thus, it had no way to remedy the condition of the uncovered pit itself, nor did it have authority to command any subcontractor to do so. Moreover, Jacobs lacked the necessary supervisory control over the state of the pit at the time of the accident, because District 230 had taken control of the theater pursuant to the temporary occupancy permit and, according to Hughes' testimony, was solely in charge of preparing the theater for the

Institute Day event. There is no support in the record that Jacobs would have had authority over the stage at that point in time to prevent District 230 employees such as Madden from conducting work on the stage in a dangerous manner.

Thus, neither Schuler nor Jacobs can be found directly liable under section 414 for failure to exercise supervisory control with reasonable care with respect to Madden's job performance that led to his injury.

### D. Admissibility of the Rokos Affidavit

Madden contends that the requisite facts required for liability on the part of Jacobs are established through portions of the affidavit of Rokos, Jacobs' on-site construction manager, which Madden contends were erroneously stricken by the trial court. Alternately, Madden contends that the trial court erred in not considering the evidence deposition of Rokos that he raised in his motion for reconsideration, as he contends that this evidence deposition cures any procedural violations that exist in the affidavit. We review the trial court's ruling on a motion to strike an affidavit in connection with a summary judgment *de novo* (*Collins v. St. Paul Mercury Insurance Co.*, 381 Ill. App. 3d 41, 46, 886 N.E.2d 1035, 1040 (2008)), and we review the trial court's ruling on a motion for reconsideration based on newly discovered evidence for abuse of discretion (*Delgatto v. Brandon Associates, Ltd.*, 131 Ill. 2d 183, 195, 545 N.E.2d 689, 695 (1989)).

The trial court struck portions of the Rokos affidavit under Illinois Supreme Court Rule 191(a), which provides, in relevant part, that affidavits filed in connection with a motion for summary judgment

> "shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which the claim, counterclaim, or defense is based; shall have attached thereto sworn or certified copies of all papers upon which the affiant relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto." 210 Ill. 2d R. 191(a).

See *Preze v. Borden Chemical, Inc.*, 336 Ill. App. 3d 52, 56-57, 782 N.E.2d 710, 714 (2002) (affidavits submitted in connection with summary judgment motions are considered substitutes for trial testimony).

An affidavit satisfies the requirements of Rule 191(a) " 'if from the document as a whole it appears the affidavit is based on the personal knowledge of the affiant and there is a reasonable inference that the affiant could competently testify to its contents.' " *Allied American Insurance Co. v. Mickiewicz*, 124 Ill. App. 3d 705, 708, 464 N.E.2d 1112, 1114 (1984), quoting *Burks Drywall, Inc. v. Washington Bank & Trust Co.*, 110 Ill. App. 3d 569, 576, 442 N.E.2d 648, 654

(1982); see *Allerion, Inc. v. Nueva Icacos, S.A. de C.V.*, 283 Ill. App. 3d 40, 46, 669 N.E.2d 1158, 1162-63 (1996). Conversely, an affidavit will be stricken under Rule 191(a) to the extent that it contains unsupported assertions and self-serving or conclusory statements. *Geary v. Telular Corp.*, 341 Ill. App. 3d 694, 699, 793 N.E.2d 128, 132 (2003).

The text of Rokos' affidavit, consisting of 10 paragraphs, is as follows:

"1. My name is KENNETH ROKOS and I was the construction manager for Jacobs at the CHSD 230 project ***.

2. Jacobs was one of the persons in charge of safety on the project. Although it was specifically excluded in the form contract, Jacobs decided that a simple contractual provision would not relieve the company of its responsibility to maintain safety on the construction project for which it was the project manager. As a result, we did period safety audits by Jacobs safety professionals, reviewed the safety programs for the main contractors, and made recommendations concerning saftey [*sic*]. We had the right to recommend removal of any contractor for safety or performance reasons.

3. I was on this project for approximately two years. I started with the site preparation and foundations and ended when the punch list items were completed in December 2002. ***

4. Usually temporary occupancy is when a majority of things are done. However a theater and auditorium setting has multiple purposes and uses for occupancy. In the summer of 2002, the Auditorium was substantially completed to the point where it could be temporarily occupied for its intended purpose. However, the stage the pit [*sic*] still had issues concerning lighting, rigging, sound and curtains which would not allow the stage to be used for its intended purpose in the summer of 2002. The full occupancy was not given until after October 15, 2002. I have seen the list of items that Schuler & Shook submitted as punch list items as of May 12, 2002 and I do not believe that the quality and quantity of items remaining would not even allow temporary occupancy unless the stage area was not being used.

5. In August of 2002, the theatre and stage would have been under the control of Jacobs, Paschen, VOA, Schuler & Shook, and the School District because of the work still being performed and yet to be performed.

6. I walked the jobsite with Gerry Meyers on this project and we pointed out safety issues to the foreman of the workers including Paschen's workers. If it was an immediate hazard I would address it with the worker directly. J.C. Crabill, the safety man for Jacobs for all three sites also walked the job independent of us and addressed safety issues of the contractors and subcontractors.

7. I was made aware of a student falling in the pit around honors night within days of it occurring. I was also aware of a Cliffs and Cables worker falling in the pit in the middle of the summer of 2002 within days of it happening. I was also made aware of Mr. Madden's fall in August of 2002.

8. The subject of the pit covers came up as a safety question before the honors night in May of 2002. My original thought was that it appeared as a safety issue. However, given it was an orchestra, I relied on VOA and Schuller [sic] & Shooks['] expertise in this area and they assured us that it was not a code violation. I did not independently look up any codes on this issue. If I knew that it was a code violation, I would not have allowed the temporary rails to have been removed or for that space to be occupied.

9. The issue of pit covers was first addressed to me in the Spring of 2002 by Bob Hughes.

10. Gerry, Steve Baldwin and I were paid our normal hourly salary to supervise the installation of the pit cover but we were not paid any additional costs other than wages. This happened on several additions on this project after we concluded our lump sum for this project."

The trial court struck paragraph 2 in its entirety for lack of foundation; paragraphs 4 and 5 in their entirety for lack of foundation and for containing legal conclusions; the third sentence of paragraph 6 for lack of foundation; the first and second sentences of paragraph 8 for lack of foundation; the fourth sentence of paragraph 8 for being conclusory; and Rokos' statements in paragraph 10 about the pay of other employees for lack of personal knowledge.

■ We agree with the able trial judge's decision to strike paragraph 5 and that section of paragraph 10 dealing with the pay of other employees. Rokos' statement in paragraph 5 that the theater area and stage would have been under the control of defendants at the time of Madden's accident constitutes a legal conclusion rather than a statement of fact. See *Steuri v. Prudential Insurance Co. of America*, 282 Ill. App. 3d 753, 755-56, 668 N.E.2d 1066, 1068 (1996) (statement by building employee that owner of building retained control over construction project was conclusory and properly stricken from affidavit). Moreover, Rokos' statement in paragraph 10 regarding the pay of other employees lacks a foundation to establish his personal knowledge; Rokos gives no explanation of how he would know about his coworkers' pay, nor is knowledge of employee pay structure something implied in the job of a construction manager.

We need not determine the propriety of the judge's decision to strike the remaining portions of the affidavit. We note at this juncture that an argument could be made that these portions were stricken in

error; however, even if these sections were admissible in evidence, they would not have an impact on the disposition of this case. On the issue of premises liability under section 343, Rokos does not raise a material issue of fact on the question of possession, since he does not dispute the issuance of the temporary occupancy permit demonstrating that possession of the land had been handed over to the district, just as in *Kotecki*, 333 Ill. App. 3d at 585, 776 N.E.2d at 776, where such relinquishment of control was sufficient to relieve a general contractor of liability for a jobsite injury. On the issue of liability due to creation of a dangerous condition under section 385, Rokos' statements do not controvert the facts in evidence showing that defendants had no decisional power with respect to the pit and therefore could not properly be considered creators of that condition, which is, as discussed above, a necessary precondition to liability under that section. See *Johnson*, 58 Ill. App. 3d at 139, 373 N.E.2d at 842. Finally, on the issue of liability due to retained control under section 414, Rokos makes no factual allegations that would indicate that Jacobs retained supervisory control over operations in the theater during the critical time period, namely, the period when possession of the theater had temporarily been handed over to District 230 and Madden's accident occurred. His statements regarding Jacobs' general role in safety procedures do not controvert the deposition testimony of Hughes that the district was solely responsible for preparing the stage for the school's Institute Day event, nor do they controvert the deposition testimony of Madden that the means and manner of his work was entirely directed by employees of the district rather than any of the parties hired to perform construction work on the theater. See *Winters*, 498 F.3d at 746.

Madden next contends that the trial court erred in refusing to consider the evidence deposition of Rokos that he submitted in connection with his motion for reconsideration. However, he provides no citation to any case law or other legal authority in support of this contention. Accordingly, the issue has been waived pursuant to Illinois Supreme Court Rule 341(h)(7). 210 Ill. 2d R. 341(h)(7) (providing that argument section of appellant's brief "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities *** relied on" and that "[p]oints not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing"); see *People v. Ward*, 215 Ill. 2d 317, 332, 830 N.E.2d 556, 564 (2005) (declining to consider point raised in brief but not supported by citation to relevant authority); *Ferguson v. Bill Berger Associates, Inc.*, 302 Ill. App. 3d 61, 78, 704 N.E.2d 830, 842 (1998) (same).

For the foregoing reasons, the trial court's grant of summary judgment in favor of defendants Schuler and Jacobs is affirmed.

Affirmed.

McBRIDE and R.E. GORDON[2], JJ., concur.

_____

[2]Oral arguments were initially heard in this case on April 30, 2009, before Justices Joseph Gordon, Margaret Stanton McBride, and Denise O'Malley. In the interim between oral arguments and the filing of this opinion, Justice Denise O'Malley retired, thereby necessitating the substitution of Justice R.E. Gordon to replace Justice O'Malley. Justice R.E. Gordon has read the briefs and record and has listened to the tape of the oral argument.