FIRST DIVISION
June 26, 2017

No. 1-16-2320
2017 IL App (1st) 162320

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| WILLIAM LePRETRE, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellant, | ) ) | Cook County. |
| v. | ) ) | |
| | ) | No. 13 L 13896 |
| LEND LEASE (US) CONSTRUCTION, INC., a Corporation, | ) ) ) | Honorable |
| | ) | Kathy M. Flanagan, |
| Defendant-Appellee. | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE CONNORS delivered the judgment of the court, with opinion. Justices Simon and Mikva concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff William M. LePretre brought a cause of action against Lend Lease (US) Construction, Inc. (Lend Lease) and other defendants for injuries he allegedly sustained while working at a construction site at 515 North Clark Street in Chicago. Lend Lease filed a motion for summary judgment, and the trial court granted it, finding that Lend Lease owed no duty to plaintiff under which it could be subject to vicarious or direct liability. The trial court also denied plaintiff's motion to reconsider, and plaintiff now appeals. We affirm.

¶ 2                                                BACKGROUND

¶ 3     Plaintiff filed a nine-count complaint against Lend Lease and other defendants seeking damages for injuries he sustained when he slipped and fell while installing iron rebar on February 15, 2012. Count I was directed at Lend Lease, and it is the only count at issue in this appeal. Lend Lease was the general contractor for the project, and it retained Adjustable Forms, Inc. (Adjustable), as the concrete sub-contractor, which in turn retained plaintiff's employer, Bond Steel, to install and reinforce the iron rebar for the concrete pour.

¶ 4     Plaintiff alleged that Lend Lease failed to make a reasonable inspection of the premises; improperly operated, managed, maintained, and controlled the premises; failed to provide plaintiff with a safe place to work; failed to warn plaintiff of the dangerous conditions there existing; failed to provide adequate safeguards; failed to supervise work being done on the premises; failed to provide a safe and proper excavation; and failed to provide safe and proper material to be placed within the excavation.

¶ 5     Lend Lease filed a motion for summary judgment contending that it owed no duty under section 414 of the Restatement (Second) of Torts because, although it retained some general supervisory powers, it did not control the incidental aspects of the work of Adjustable or Bond Steel. Lend Lease noted that in plaintiff's discovery deposition, plaintiff attributed his injury to three factors: the rebar pieces that he was installing were too long, the workspace he was in was too confined, and there was loose, falling dirt. Lend Lease argued that the contract between it and Adjustable, and the one between Adjustable and Bond Steel, showed that it retained no control over the rebar length, the work space, or debris removal and did not direct or control plaintiff's work.

¶ 6    Lend Lease attached relevant portions of the contracts to its motion for summary judgment. These attachments showed that Lend Lease entered into a contract with the owner of the project, ClarGran, for the construction of Clark and Grand Hotels. Section 3.3.1 of the General Conditions of that contract provided:

"The Contractor [Lend Lease] shall be solely responsible for and have control over construction means, methods, techniques, sequences, and procedures and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters ***."

¶ 7    Section 10.2.1 of the General Conditions provided:

"The Contractor shall take reasonable precautions for the safety of, and shall provide reasonable protection to prevent damage, injury or loss to:

1. employees on the Work and other persons who may be affected thereby ***."

¶ 8    Lend Lease then entered into a subcontract with Adjustable for the concrete work on the project. Portions of this subcontract were attached to Lend Lease's motion for summary judgment. "Exhibit B—Scope of Work" in the subcontract provided:

"Subcontractor [Adjustable] shall provide all labor, material, equipment, supervision as required to complete all scope-of-work items on this Concrete Subcontract and related work, in accordance with the Drawings, Specifications and the Contract Documents ('Work')."

¶ 9    Article 15 of the subcontract provided:

"Subcontractor agrees that the prevention of accidents to workers engaged upon or in the vicinity of the work is its responsibility, even if the Contractor [Lend

Lease] establishes a safety program for the entire Project. Subcontractor shall establish and implement safety measures, policies and standards ***."

¶ 10   Article 16 provided:

"Subcontractor shall, at its own expense: (a) keep the premises at all times free from waste materials *** and other debris accumulated in connection with the Work by collecting and removing such debris from the jobsite on a daily or other basis ***."

¶ 11   Adjustable then hired Bond Steel to perform the rebar reinforcement installation portion of the concrete work. Lend Lease attached portions of that subcontract to its motion for summary judgment, which indicated that the prevention of accidents and injuries shall be the primary concern of Bond Steel and that it should maintain a safe and healthful work environment with its safety program. The contract also noted that Bond Steel "shall submit a copy of [its] safety program together with the name and experience of [its] on-site safety representative." The contract stated that Bond Steel agreed to comply with OSHA and all safety and health requirements imposed by Adjustable and Adjustable's "Subcontractor Safety Handbook" and would conduct operations in a safe and healthy manner.

¶ 12   Lend Lease noted that Adjustable hired Gerdau Ameristeel to design and provide all the reinforcing steel needed to complete the concrete work in accordance with the project construction documents. The purchase order was attached to the motion for summary judgment.

¶ 13   Lend Lease also attached several deposition transcripts to its motion for summary judgment. Plaintiff stated in his discovery deposition that he was Bond Steel's foreman on the project and was in charge of the Bond Steel crew. Plaintiff and his crew took directions with respect to what they would do on a daily basis from Adjustable's superintendent, Eric Blank.

Plaintiff testified that he did not take any direction as to how to install steel, what materials to use, or where to work from anyone employed by Lend Lease. Plaintiff testified in his deposition that Lend Lease never stopped Bond Steel's work for safety reasons, and did not provide safety direction specifically relating to the installation of the rebar. He further testified that Lend Lease conducted a site orientation for all new employees to discuss general safety.

¶ 14    Plaintiff also testified that at the time of his accident, he and his crew were installing a 27-foot long piece of rebar and that plaintiff believed the rebar was too long and the work space was too tight because he had to leverage the bars into place. Plaintiff testified that he complained to Blank about the length of the rebar and the size of the work space, and asked him to get shorter bars. Plaintiff testified that Blank did not heed his request because Adjustable was pouring the concrete the next day around the rebar. Plaintiff testified that he never had any discussions with anyone from Lend Lease concerning any safety issues or construction methods.

¶ 15    Phil Schwarz, Lend Lease's general superintendent, testified that he did not know plaintiff and had not heard of the incident. He testified that Lend Lease's primary function on the project was to coordinate the various subcontractors and monitor progress.

¶ 16    Blank, Adjustable's superintendent, testified that he was the top supervisory person on site and that he did not recall plaintiff or anyone else complaining to him about the tight work space or the length of the rebar used. Blank testified that he ordered the rebar for Bond Steel's work by communicating with Gerdau Ameristeel directly. Blank testified that he never had any conversations with anyone from Lend Lease regarding rebar length, work space in the North Core, or loose dirt on the floor.

¶ 17    Dan Bond, the head of safety for Bond Steel at the time of the incident, testified that plaintiff did not mention any safety concerns to him and that Bond never spoke to anyone at

Lend Lease as to concerns about Bond Steel's work or the conditions. Bond testified that Bond Steel had a "Site Specific Safety Manual" that required photographs to be taken at the scene of any accident or injury on the project. Bond testified that he was not aware of any photographs of the site of the incident or any report by plaintiff or anyone else of dirt on the floor.

¶ 18    Sean Bond, the field superintendent for Bond Steel, testified that Bond Steel had no contractual relationship with Lend Lease and that for this project he dealt solely with Blank from Adjustable. He testified that Adjustable was responsible for directing the work of Bond Steel and where the Bond Steel crew was to work on any particular day.

¶ 19    Finally, Darvin Hidalgo and John Stacks, Bond Steel ironworkers, testified that plaintiff provided them with instruction on a day-to-day basis and that no one from Lend Lease ever gave Bond Steel any instructions as to how to perform its work on the project.

¶ 20    Plaintiff filed a response in opposition to Lend Lease's motion for summary judgment, maintaining that Lend Lease retained control over the work at the project. Plaintiff argued that Lend Lease, as general contractor, retained control over the means and methods and operative details of the work and that it was therefore vicariously liable for plaintiff's injuries. Specifically, plaintiff contended that Lend Lease's safety professional was present on site full time and had the authority to inspect the work being performed and had the power to stop the work from being performed until he was satisfied that the means and methods used were safe.

¶ 21    The trial court found that there was no evidence that Lend Lease retained control over the means and methods or operative details of the work of Bond Steel and plaintiff. It found that there was also no evidence that Lend Lease retained control over the safety of the job. The trial court noted that "having the authority to stop the work, a safety program, or a safety director, without more, are merely the general responsibilities of a general contractor and are insufficient

to establish retained control." The trial court further found that there was no evidence that Lend Lease engaged in the type of pervasive supervision that affects the means and methods of the work and gives rise to liability. Plaintiff now appeals.

¶ 22                                    ANALYSIS

¶ 23    On appeal, plaintiff maintains that Lend Lease's motion for summary judgment should not have been granted where Lend Lease retained supervisory control of the safety of the work being performed. Plaintiff contends that whether a general contractor retained sufficient supervisory control over the work is a question of fact for the jury to decide. Lend Lease responds that Lend Lease did not control the means and methods of the work and, therefore, is not liable.

¶ 24    The purpose of summary judgment is to determine whether a genuine issue of material fact exists. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). A trial court should grant summary judgment where " 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Id.* (quoting 735 ILCS 5/2-1005(c) (West 2002)). This court reviews a trial court's grant of summary judgment *de novo*. *Id.*

¶ 25    Plaintiff's lawsuit against defendants was based on common-law negligence. "In any action for negligence, the plaintiff must present sufficient evidence to establish the defendant owed a duty to the plaintiff." *Rangel v. Brookhaven Constructors, Inc.*, 307 Ill. App. 3d 835, 837 (1999). The court decides as a matter of law whether a duty exists, and if no duty exists, there can be no recovery. *Id.* at 837-38.

¶ 26    The general rule in Illinois is that a party who entrusts an independent contractor will not be held vicariously liable for tortious acts or omissions committed by the independent contractor.

*Madden v. F.H. Paschen/S.N. Nielson, Inc.*, 395 Ill. App. 3d 362, 381 (2009). Because the hiring entity has no control over the details and methods of the independent contractor's work, it is not in a good position to prevent negligent performance, and liability, therefore, should not attach. Rather, the party in control—the independent contractor—is the proper party to be charged with that responsibility and bear the risk. *Fonseca v. Clark Construction Group, LLC*, 2014 IL App (1st) 130308, ¶ 26; *Pestka v. Town of Fort Sheridan Co.*, 371 Ill. App. 3d 286, 300 (2007). This does not mean that one who hires an independent contractor is absolutely immune from tort liability for a plaintiff's injuries. Rather, as section 414 of the Restatement (Second) of Torts explains, a hiring entity may be liable for its own negligence where it retains some control over the independent contractor:

> "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414 (1965).

¶ 27 Accordingly, if sufficient control is exercised over the independent contractor, then the general rule no longer applies. Comment a of section 414 provides:

> "a. If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant. The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order

in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others." Restatement (Second) of Torts §414 cmt. a (1965).

¶ 28    Many appellate court decisions, as well as the trial court decision in this case, have cited section 414 of the Restatement to impose both vicarious liability and direct liability against the employer of an independent contractor. *E.g.*, *Lederer v. Executive Construction, Inc.*, 2014 IL App (1st) 123170, ¶ 49; *Ramirez v. FCL Builders, Inc.*, 2014 IL App (1st) 123663, ¶ 123. As our supreme court has recently held, however, the rule in section 414 only articulates a basis for imposing direct liability. *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 36. Because an employer of an independent contractor is typically not answerable for the contractor's negligence, "the employer's liability must be based upon his own personal negligence." Restatement (Second) of Torts, ch. 15, topic 1, Introductory Note, at 371 (1965). Section 414 sets forth one way in which an employer of an independent contractor may be negligent and therefore directly liable for physical harm to others. Restatement (Second) of Torts § 414 (1965).

¶ 29    Our supreme court in *Carney* stated that the first sentence of comment a above explains when section 414 does *not* apply. *Carney*, 2016 IL 118984, ¶ 38 (citing *Aguirre v. Turner Construction Co.*, 501 F.3d 825, 829 (7th Cir. 2007)). If the control retained by the employer is such that it gives rise to a master-servant relationship, the employer may be liable for the negligence of the contractor's employees under the laws of agency. *Id.* However, agency law, under which an employer may be vicariously liable for the torts of its employees, is not the same

9

as when an employer is directly liable for its own negligence. In other words, " 'section 414 takes over where agency law ends.' " *Id.* (quoting *Aguirre*, 501 F.3d at 829).

¶ 30    The issue of a defendant's retained control may be decided as a matter of law where the evidence is insufficient to create a factual question. *Id.* ¶ 41. "The best indicator of whether the defendant retained control sufficient to trigger the potential for liability under section 414 is the written agreement between the defendant and the contractor." *Id.* (citing *Cain v. Joe Contarino, Inc.*, 2014 IL App (2d) 130482, ¶ 76). "But even if the agreement provides no evidence of retained control by the defendant, such control may yet be demonstrated by evidence of the defendant's conduct at variance with the agreement." *Id.*

¶ 31    In the case at bar, there was no contract between Lend Lease and Bond Steel, plaintiff's employer. Rather, there was a contract between Lend Lease and Adjustable for the concrete work on the project. Adjustable then entered into a subcontract with Bond Steel to reinforce the iron rebar before pouring concrete. Accordingly, plaintiff relies on the contract between Lend Lease and the owner of the building, ClarGran, as well as the contract between Lend Lease and Adjustable, to support his argument that Lend Lease retained control of the safety of the project. Plaintiff points to the language in the ClarGran contract that states Lend Lease would be solely responsible for and have control over construction means, methods, techniques, sequences, and procedures and for coordinating all portions of the work under the contract. He also points to the section that states Lend Lease "shall take reasonable precautions for the safety of, and shall provide reasonable protection to prevent damage, injury, or loss to *** employees on the Work and other persons who may be affected thereby." The Safety Requirements of the contract indicated that each subcontractor "shall establish a Site Specific Safety Program (SSSP) in detail commensurate with the requirements of the project." They also indicated that all employees were

to attend a safety orientation. Plaintiff also notes that the contract between Lend Lease and Adjustable states that Adjustable shall "stop any part of the Work that Contractor deems unsafe until corrective measures satisfactory to Contractor have been taken," and that "Contractor will review the Safety and Health Program prior to the start of the work."

¶ 32    Plaintiff maintains that based on these provisions, Lend Lease retained control over the safety of the work. We disagree. These provisions cited by plaintiff are part of the general rights reserved to someone, like Lend Lease, who employs a contractor, rather than evidence that Lend Lease retained control over the manner in which work by Adjustable was performed. See *id.* ¶ 46 (provisions in the contract that allowed the defendant to terminate the contract if the defendant deemed the independent contractor's work to be unsatisfactory, requiring the work by the independent contractor to be done in a workmanlike manner to the satisfaction of the defendant, and giving the defendant the right to stop the work or make changes, as the interests of defendant may require, were part of the "general rights reserved to someone, like defendant, who employs a contractor, rather than evidence that defendant retained control over the manner in which work by [an independent contractor] was performed"). "A general contractor's rights to stop work and order changes are general rights of supervision and not a retention of control over the incidental aspects of the work." *Fonseca*, 2014 IL App (1st) 130308, ¶ 28 (citing *Calderon v. Residential Homes of America, Inc.*, 381 Ill. App. 3d 333, 346 (2008)). As stated in comment c to section 414 of the Restatement (Second) of Torts:

> "c. In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make

suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."

Restatement (Second) of Torts § 414 cmt. c (1965).

¶ 33    Moreover, a general right to enforce safety does not amount to retained control under section 414. *Joyce v. Mastri*, 371 Ill. App. 3d 64, 74 (2007). "The mere existence of a safety program, safety manual, or safety director is insufficient to trigger [section 414]." *Madden*, 395 Ill. App. 3d at 382. "Even if the general contractor retains the right to inspect work, orders changes to the plans, and ensures that safety precautions are observed and the work is done safely, the general contractor will not be held liable unless the evidence shows that the general contractor retained control over the incidental aspects of the independent contractor's work." *Fonseca*, 2014 IL App (1st) 130308, ¶ 28 (citing *Rangel*, 307 Ill. App. 3d at 839).

¶ 34    Here, the contract placed control of job safety with Adjustable. Specifically, the contract between Lend Lease and Adjustable indicated that Adjustable was to provide all labor, material, equipment, and supervision as required to complete "all scope-of-work items on this Concrete Subcontract and related work." It also made clear that "the prevention of accidents to workers engaged upon or in the vicinity of the work is its responsibility, even if the Contractor [Lend Lease] establishes a safety program for the entire Project." It further stated that Adjustable "shall establish and implement safety measures, policies and standards," and at its own expense keep the premises at all times free from waste materials and "other debris accumulated in connection with the Work by collecting and removing such debris from the jobsite on a daily or other basis."

Accordingly, we find nothing within the contracts indicating that Lend Lease retained control such that Adjustable was not entirely free to do the work in its own way. See *Carney*, 2016 IL 118984, ¶ 46 (the contract placed control of job safety with independent contractor where independent contractor was required to keep the job site free from safety and health hazards and ensure that its employees were competent and adequately trained in all safety and health aspects of the job).

¶ 35    We find the analysis in the recent case of *Fonseca* to be helpful. In *Fonseca*, the plaintiff was the contractor for RG Construction, a drywall subcontractor of Clark Construction. After he was injured at the building in question, he ultimately sued Clark Construction and Maron Electric, another subcontractor, for negligence, alleging that Maron Electric failed to remove its construction debris from the area where he was working, causing him to fall, and that Clark Construction failed to properly supervise the work being done on the construction site. The trial court granted Clark Construction's motion for summary judgment, finding that Clark Construction did not owe a duty under section 414 of the Restatement (Second) of Torts because Clark Construction did not control the means and methods or operative details of Maron Electric's work.

¶ 36    On appeal, this court agreed, finding that although the Clark contract provided Clark Construction with general supervisory authority, Clark Construction did not exercise this authority and in no way altered or directly supervised the work of Maron Electric. *Fonseca*, 2014 IL App (1st) 130308, ¶ 29. This court looked in part at the language in the Maron subcontract which stated that Maron Electric assumed the entire responsibility and liability for work, supervision, labor, and materials used in conjunction with the construction of the building and that Maron Electric was responsible for cleaning and removing all debris from its work area.

13

This court also relied on deposition testimony that indicated it was Maron Electric's responsibility to inspect its own work and clean its own debris and that Clark Construction never stopped Maron Electric's work. Maron Electric controlled the means and methods of its own work during construction of the building. Thus, this court found that Clark Construction did not retain control over Maron Electric's work. *Id.*

¶ 37    The contract provisions in *Fonseca* were similar to those of the case at bar. In *Fonseca*, 300 LaSalle LLC, the owner of the building, and Clark Construction executed a contract which stated in part:

> " '[Clark Construction] shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under Contract Documents or otherwise required by good construction practice or by any applicable code. Contactor understands and acknowledges that although certain construction means, methods, techniques, sequences and procedures necessary for the completion of the Project may be referenced in the Contract Documents, it shall remain responsible for and have control over the construction means, methods, and techniques necessary to comply with such sequences and procedures.' " *Id.* ¶ 4.

¶ 38    Section 3.3.2 of the contract stated:

> " '[Clark Construction] shall be responsible to [300 LaSalle] for acts and omissions of [Clark Construction's] employees, suppliers, consultants, Subcontractors and Sub-Subcontractors and their respective agents and employees, and all other persons or entities performing portions of the Work.' " *Id.* ¶ 5.

14

¶ 39    Section 10.2.1 of the same contract stated:

   " '[Clark Construction] shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work, including safety of all persons and property during performance of the Work. This requirement shall apply continuously throughout the course of the Work and shall not be limited by normal working hours. Clark Construction shall take all reasonable precautions and safety measures, including those listed in the Contract Documents (which are presumably deemed reasonable), for the safety of, and shall provide reasonable protection to prevent damage, injury or loss to:

      1. All employees on, and persons performing, the Work and all other persons who may be affected thereby.' " *Id.* ¶ 6.

¶ 40    Clark Construction and Maron Electric also executed a subcontract, which stated in part:

   " '[Maron Electric] shall perform all work and shall furnish all supervision, labor, materials, plant, scaffolding, tools, equipment, supplies and all other things necessary for the construction and completion of the work described in Exhibit B and work incidental thereto, in strict accordance and full compliance with the terms of the Contract Documents (which are hereby incorporated by reference) and this Subcontract and to the satisfaction of [Clark Construction] and [300 LaSalle].' " *Id.* ¶ 7.

¶ 41    The Maron subcontract also stated:

   " '[Maron Electric] hereby assumes the entire responsibility and liability for all work, supervision, labor and materials provided hereunder, whether or not erected in place, and for all plant, scaffolding, tools, equipment, supplies and

15

other things provided by [Maron Electric] until final acceptance of work by [300 LaSalle] as defined by the Contract Documents.' " *Id.* ¶ 8.

¶ 42    The Maron subcontract also stated that Maron Electric " 'shall clean its work and remove all debris resulting from its work in a manner that will not impede either the progress of the Project or of other trades.' " *Id.* ¶ 9. Exhibit D of the Maron subcontract stated that the contract included daily cleanup of all trash and debris in its work area and that Clark Construction had the right to reject the work of Maron Electric if it did not conform to the requirements of the Maron subcontract. An 18-page safety and health manual was incorporated in the Maron subcontract, which stated that " '[a]ll subcontracting personnel are required to follow all of [Clark Construction's] safety and health policies, in addition to their own company program.' " *Id.* ¶ 10. The safety manual established that Clark Construction had a safety manager for the project, and that Maron Electric was required to attend a safety orientation conducted by Clark Construction's safety manager prior to starting work. The safety manual required " 'toolbox talks' " with the site's workers using forms provided by Clark Construction and that Maron Electric was required to attend monthly safety meetings. *Id.*

¶ 43    Looking at these provisions, this court found that because the Maron subcontract stated that Maron assumed the entire responsibility and liability for work, supervision, labor, and materials used in conjunction with the project, Maron Electric was responsible for cleaning and removing all debris from its work area, and Maron Electric was bound by all laws, codes, ordinances and regulations applicable to the Maron subcontract through general law or the Clark contract, the facts showed that Clark Construction did not have control over the way Maron Electric conducted its work. This court further looked at the deposition of the senior safety manager of Clark Construction, who stated she walked around the jobsite to make sure that

16

people were working safely but did not recall ever stopping anyone work, and the deposition of the senior superintendent of Clark Construction, who stated it was Maron Electric's responsibility to clean its own debris, Clark Construction never stopped Maron Electric's work, and Maron Electric controlled the means and methods of its own work during construction of the building. *Id.* ¶ 29.

¶ 44 Similarly in the case at bar, Phil Schwarz, Lend Lease's general superintendent, stated in his deposition that the subcontractors determined their own means and methods by which they performed their work and that Lend Lease delegated its trade-specific safety and workmanship to the subcontractors. Eric Blank, Adjustable's superintendent did not recall ever hearing anyone from Lend Lease instructing anyone from Adjustable or Bond Steel how to do their work and testified that if there was debris in the work area, Adjustable or Bond Steel workers were responsible for cleaning up. Ironworkers for Bond Steel testified that the only time someone from Lend Lease spoke to them was during the safety orientation on their first day. Plaintiff testified that he and his crew took directions from Eric Blank, Adjustable's superintendent, and that they did not take any direction from anyone employed by Lend Lease as to how to install steel, what materials to use, or where to work. He also testified that Lend Lease never stopped Bond Steel's work for safety reasons and did not provide safety direction specifically relating to the installation of the rebar.

¶ 45 As in *Fonseca*, we find that the contract provisions, coupled with the various deposition testimonies, confirm that Lend Lease's conduct was insufficient as a matter of law to establish that it retained supervisory control over the safety of the work such that it owed a duty to plaintiff. We note, as did our supreme court in *Carney*, that "[t]o hold otherwise would penalize a defendant's safety efforts by creating, in effect, strict liability for personal injury to any job site

employee." *Carney*, 2016 IL 118984, ¶ 61. See *Connaghan v. Caplice*, 325 Ill. App. 3d 245, 250 (2001) ("the right to stop the work, tell the contractors to be careful, and change the way something [is] being done if [the defendant] felt something was unsafe" does not establish sufficient retention of control for purposes of section 414); *Fris v. Personal Products Co.*, 255 Ill. App. 3d 916, 924-25 (1994) (imposing duty under section 414 where the defendant retained only a general right to require that work be done in a safe manner would result in strict liability for all injuries to employees of independent contractors).

¶ 46     Plaintiff's reliance on *Lederer*, does not convince us otherwise. In *Lederer*, a case that was called into question by our supreme court in *Carney*, the subcontracts required the subcontractors to attend weekly coordination meetings with the general contractor, and the safety manual specifically prohibited the use of "stilts" by the general contractor or the subcontractors. *Lederer*, 2014 IL App (1st) 123170, ¶¶ 57-58. The court found that although the mere existence of a safety program, safety manual, or safety director is insufficient, standing alone, to impose liability under the retained control exception, the general contractor specifically prohibited one means or method of performing the work, which was enough to subject it to liability. Evidence in the record showed that laborers looked to the general contractor to remedy a safety hazard and that the general contractor had a strong presence on the site inspecting safety precautions. *Id.* These facts are not present in the case at bar. Rather, the facts show that Lend Lease did not provide safety guidelines as to the installation of the rebar, did not communicate with Bond Steel or its employees on how to install the rebar, and employees did not look to Lend Lease to remedy any sort of alleged safety hazard. Accordingly, we reject plaintiff's reliance on *Lederer* and maintain that Lend Lease did not retain enough control over the work on this project to subject it to liability under section 414 of the Restatement (Second) of Torts.

¶ 47    In light of our holding, we need not consider plaintiff's further arguments. Plaintiff's second argument, that Lend Lease failed to exercise its supervisory control with reasonable care, is based on the fact that Lend Lease retained enough control to bring it within the purview of section 414, which we have found it did not. Restatement (Second) of Torts § 414, cmt. c (1965) ("In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done."). And plaintiff's third argument is based on vicarious liability through the laws of agency. However, as we explained above, section 414 takes over where agency law ends. *Carney*, 2016 IL 118984, ¶ 38 (if the control retained by the employer is such that it gives rise to a master-servant relationship, the employer may be liable for the negligence of the contractor's employees under the laws of agency, however, agency law is not the same as when an employer is directly liable for its own negligence—so " 'section 414 takes over where agency law ends' " (quoting *Aguirre*, 501 F.3d at 829)). Comment a of section 414 explains that if the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees under the rules of that part of the law of agency that deals with the relation of master and servant. Restatement (Second) of Torts § 414 cmt. a (1965). It further states that the employer may, however, "retain a control less than that which is necessary to subject him to liability as master," which is supervisory control discussed in section 414. *Id.* Since we have found there was not enough evidence to establish supervisory control under section 414, it therefore follows that there was not enough evidence to establish control over the operative details of the work such that there was a master-servant relationship under the laws of agency.

¶ 48                           CONCLUSION

¶ 49    Accordingly, for the foregoing reasons, we affirm the judgment of the circuit court of

Cook County.

¶ 50    Affirmed.