**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 190373-U

Order filed March 15, 2021
_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| DAVID DUDEVOIRE, | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| Plaintiff-Appellant, | ) | Kankakee County, Illinois. |
| | ) | |
| v. | ) | |
| | ) | |
| CSL BEHRING, LLC, a Foreign Limited | ) | |
| Liability Company and MECHANICAL, INC., | ) | |
| an Illinois Corporation, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| _____ | ) | Appeal No. 3-19-0373 |
| | ) | Circuit No. 14-L-83 |
| CSL BEHRING, LLC, | ) | |
| | ) | |
| Third Party Plaintiff-Cross Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES McHUGH CONSTRUCTION | ) | |
| COMPANY, | ) | Honorable Adrienne Albrecht, |
| | ) | Judge, Presiding. |
| Third Party Defendant-Cross Appellee. | ) | |
| _____ | ) | |
| | ) | |
| MECHANICAL, INC. | ) | |
| | ) | |
| Third Party Plaintiff-Cross Appellant, | ) | |
| | ) | |
| v. | ) | |

_____

JUSTICE SCHMIDT delivered the judgment of the court.
Presiding Justice McDade and Justice Lytton concurred in the judgment.


**ORDER**

¶ 1    *Held*:    The trial court did not err when it granted defendants' motions for summary judgment.

¶ 2    Plaintiff, David Dudevoire, appeals the trial court's grant of defendants', CSL Behring, Inc. (CSL), and Mechanical, Inc. (Mechanical), motions for summary judgment. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Dudevoire filed a complaint against CSL and Mechanical. The complaint arose from an injury Dudevoire sustained while stripping concrete forms in the basement area of new construction at CSL's human blood plasma fractionation facility. As Dudevoire carried scrap wood from the basement to the disposal area, he stepped onto a raised concrete pad, then slipped on a piece of blue plastic that had been left on top of the concrete pad. The slip caused him to suffer a knee injury. At the time of the injury, Dudevoire was employed by the general contractor for the project, James McHugh Construction Company (McHugh).

¶ 5    Count I of the complaint alleged construction negligence under section 414 of the Restatement (Second) of Torts in that CSL retained control of the means and methods on the construction site through its superintendence of the construction site and hands-on enforcement of the construction safety measures. Count II alleged a theory of premises liability in that CSL, as the owner of the property, knew or should have known of the dangerous condition, failed to make a

reasonable inspection of the area, failed to enforce its safety policies, and failed to remove the tripping hazard in a timely fashion from the work area. Count III alleged that CSL was directly negligent by failing to exercise reasonable care in the performance of its work at the construction site.

¶ 6    Count IV of the complaint alleged that defendant, Mechanical, acted negligently in that its agents left the blue plastic on the floor that caused Dudevoire's injuries.

¶ 7    The parties completed written discovery during which the following facts were adduced. Defendant, CSL, began a construction project to create a new addition to one of its buildings. The project involved three contracts. The contract between CSL and McHugh, the subcontract between McHugh and Mechanical, and the sub-subcontract between Mechanical and M&M.

¶ 8    The contract between CSL and McHugh provided that McHugh, "shall supervise and direct the Work, using [McHugh's] best skill and attention. [McHugh] shall be solely responsible for, and have control over, construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters." The prime contract further provided that McHugh, "shall be responsible for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent Work." As to labor and materials, McHugh was responsible for providing and paying for "labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for proper execution and completion of the Work." In addition, McHugh was required to designate an on-site superintendent responsible to prevent accidents to serve as McHugh's superintendent unless otherwise designated by McHugh in writing to CSL. McHugh

was also responsible for "initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract."

¶ 9    McHugh entered into a subcontract with Mechanical. Mechanical undertook the initial responsibility for both the HVAC pipe fitting and all stainless-steel ductwork. Mechanical then subcontracted out all the stainless-steel ductwork to M&M. The contract required Mechanical to abide by the terms set forth in the contract between McHugh and CSL.

¶ 10    The sub-subcontract between Mechanical and M&M provided as follows. M&M was to provide the "labor materials, equipment, machinery or services" necessary to complete the stainless-steel ductwork. Under the terms of the contract, Mechanical was not "obligated to notify [M&M] when to begin, cease or resume work, or to superintend [M&M's] so as to relieve [M&M] of responsibility for any consequence of neglect or carelessness by [M&M] or those for whose acts and omissions [M&M] is responsible." The contract further provided that M&M had a specific duty to "take all reasonable safety precautions with respect to [M&M]'s Work, and shall comply with such safety measures and accident reporting procedures as may be initiated by [Mechanical] or authorized third parties." The contract provided that M&M also had the "primary responsibility for compliance with applicable federal and state laws and regulations pertaining to workplace safety, including but not limited to the Occupational Safety and Health Act." This provision was qualified in that "[Mechanical's] authority to initiate safety measures shall not relieve [M&M] of such responsibility." Finally, the contract addressed M&M's housekeeping responsibilities by requiring that "[M&M] will clean up and haul off the premises, or to a place on the premises specifically designated by [Mechanical], all debris occasioned by the Work done hereunder and will leave the Project and premises clean and free of equipment, machinery, materials, temporary

facilities and debris. Any trash, debris, or liquid that poses a possible threat of fire or safety shall be removed from the premises immediately."

¶ 11    Dudevoire testified at his deposition that at the time of the injury, he was removing wood forms from the concrete pads that had been laid the previous week. He was injured on a Tuesday morning. Dudevoire did not know if anyone had worked on Saturday or Sunday but believed the plastic may have been left on the concrete pad the Friday before the accident. While walking with the wood in his hands, he stepped on a blue plastic bag that had been left on a concrete pad. He twisted his knee, which caused an injury. Dudevoire assumed the plastic was left by a Mechanical employee because he had seen HVAC workers installing ductwork that was wrapped with the same type of blue plastic. He believed the blue plastic came from an HVAC contractor because he believed that only the HVAC contractors had blue plastic on its materials. According to Dudevoire, the Friday before his accident, HVAC contractors were hanging ductwork 20 feet from where he was working, and its materials were right next to the cement pad he slipped on. He acknowledged that he was speculating that the plastic came from an HVAC contractor as he did not inspect all the other contractors' supplies and equipment.

¶ 12    Dudevoire did not know whether CSL had knowledge that the plastic was on the concrete pad. As far as Dudevoire knew, no one reported the plastic on the concrete pad before the accident. The only reason he believed that a HVAC contractor left the plastic on the ground was that its materials were near the concrete pad and that he previously saw the HVAC contractors dropping blue plastic on the floor.

¶ 13    Robert "Skip" Irwin, CSL's project safety advisor at the construction site, testified that he had CSL's authority to stop work if he witnessed a safety risk and the authority to request work to be done in accordance with basic OSHA and CSL safety standards. Although he had authority to

stop work if there was a safety violation or hazard, he did not exercise the authority when the case was not severe. For example, he would tell the employee to correct the safety issue, such as putting on safety glasses.

¶ 14　　　According to Irwin, all day-to-day activities were handled by McHugh and the individual contractors. Irwin did not directly instruct a member of a trade how to safely operate a piece of machinery. While Irwin was the "lead safety person," each contractor was responsible for the safety of its own employees and housekeeping. Irwin only made sure that the workers followed certain CSL and OSHA rules. Irwin did not believe that CSL furnished any tools, equipment, or materials for the project.

¶ 15　　　Although Irwin was tasked with safety on the worksite, McHugh and the other subcontractors were the ones in the position to determine what the best means, methods, techniques, sequences, and procedures were with respect to the work done at the project. Based on Irwin's education, knowledge, and skill, he was not in a position to determine which manner each contractor would use to do his or her own work, beyond a general safety problem. To the contrary, Irwin believed it would be dangerous for him to instruct or direct the contractors' means or methods of work in their trades. It was not Irwin's job to inspect each contractors' work and make sure the work was done properly or control the day-to-day safety and operations of the contractors. Instead, his job was to retain control over enforcement of general OSHA safety guidelines.

¶ 16　　　Scott Richards, a senior engineer for CSL, explained that the project was to create a human blood plasma fractionation facility. Richards had limited involvement with the contractors' installation. He only answered written technical questions. CSL provided equipment to the contractors to be installed at the project. He did not tell the contractors what tools or equipment to use to install CSL's machines. He answered technical questions from the contractors of what the

equipment did rather than telling the contractors how to install the equipment. While CSL ordered the equipment to be installed, CSL did not provide any tools, equipment, or manpower to install the equipment.

¶ 17    Prior to the accident, Richards was involved in an e-mail between CSL, McHugh, M&M, and Mechanical. In the e-mail, CSL requested that McHugh, Mechanical, and M&M instruct their employees and ensure the ends of the ductwork were covered before it was installed by the contractors to prevent debris from collecting inside and then circulating throughout the building's HVAC system. The e-mail stated that CSL saw "something we don't like," and "would like it to be resolved moving forward." Had the ductwork issue not been resolved, it would have been the contractors' responsibility to clean the ducts before the HVAC air units were started up. The same day the e-mail was sent, Jim Hults, the owner of M&M, sent an e-mail to Richards acknowledging that Hults had made a commitment to Richards "to provide covering on-site," so Hults could "ship more product per truckload," but since it was "not working as planned," Hults would inform his supplier "to apply plastic film on all future duct orders."

¶ 18    Dale Rosene, the Site Director of environmental health and safety for CSL's facility, testified that he was in charge of overseeing the environmental programs, compliance programs, safety programs, employee safety, building construction safety, manufacturing safety, transportation, and sales force. Rosene testified that Irwin's responsibilities were to oversee CSL's safety program at the project. Irwin had authority to stop work if he observed a safety risk and to request work be done in accordance with basic OSHA and CSL safety standards. Any equipment that was installed for the project was purchased by CSL. None of the tools, equipment, or materials used to install the equipment were purchased by CSL.

¶ 19      According to Rosene, he had the authority to stop a contractor's work if he saw something that was "immediately dangerous to life and health." Rosene did not ever have to stop a contractor from performing work due to a dangerous activity during the project. Rosene noted that Irwin organized a safety orientation for contractors prior to commencing work on the premises. However, there were no specific guidelines for the jobsite, the safety orientation class was just a safety orientation for contractors. For a contractor to work for CSL, he or she was required to undergo CSL's safety orientation led by Irwin. The program was a general safety orientation that was provided for all CSL projects.

¶ 20      For a contractor to work at CSL, he or she needed to have an OSHA-10 or better training card, a Three River Safety Training Card, or a Prairie Safety Council Card. This was required by state and federal law.

¶ 21      McHugh employees Lance Larson, Kevin Daniels, and Guilivaldo "Willie" Jimenez all testified that CSL did not oversee the means, manner, or methods of work performed by each independent contractor. Larson testified that CSL controlled the design of the project, but CSL's engineering department did not control the operative details. Daniels testified that the operative details were determined by the contractor performing the work. According to Daniels, neither McHugh nor CSL paid, supplied materials to, or controlled the means, manner, or method of the work performed by the other contractors. When the work was subcontracted to Mechanical, Mechanical was responsible for the means, manner, and methods of work it did. However, when Mechanical subcontracted the ductwork to M&M, it was understood that Mechanical was not responsible for the means, manner, or methods of M&M's work.

¶ 22    Larson, Daniels, and Jimenez claimed to have no knowledge of any plastic left in the basement that would have given CSL notice of the alleged tripping hazard that caused Dudevoire's injury.

¶ 23    James Hults testified that he owned M&M. Hults agreed that even though Irwin was a safety representative at the project, Irwin did not get involved in the means, manner, or methods of the work performed by each contractor. CSL never supplied M&M tools, paid its employees, or told M&M how to perform sheet metal work. Hults acknowledged that safety was every parties' responsibility, it was not each contractor's job to perform safety checks of other contractors at the project. Hults also acknowledged that the ductwork M&M installed had a blue plastic cover over the exposed ends. The plastic was used to protect the inside of the ducts from dust. Hults agreed that it was M&M's responsibility to discard any of the ductwork plastic wrap into a designated trash receptacle.

¶ 24    Matthew Huenefeld, Mechanical's project manager, testified that he had no first-hand knowledge of Dudevoire's injury. Mechanical did not perform any of the ductwork at the project, as that work was subcontracted to M&M. While Mechanical was overseeing M&M's work, he did not have general authority to tell M&M's employees to stop work if he saw a safety hazard. If he observed a safety hazard, he would contact the project manager from M&M.

¶ 25    Huenefeld did not recall seeing M&M taking plastic off the ductwork. He also had no recollection that anyone saw blue plastic on the ground within the days of the accident.

¶ 26    Chris Loring, an employee of Mechanical, testified that he walked the jobsite at least two times a month to check on Mechanical's progress. He testified that when new ductwork is delivered it was usually wrapped in plastic.

¶ 27     After finishing discovery, CSL and Mechanical filed motions for summary judgment. The trial court granted the motions. The court found that Dudevoire failed to present evidence that CSL was directly negligent or negligent under a premises liability theory. The court also found that Dudevoire failed to present evidence that CSL or Mechanical retained sufficient control over M&M to impose liability under section 414. Dudevoire appeals.

¶ 28                                   II. ANALYSIS

¶ 29     On appeal, Dudevoire argues that the trial court erred in granting defendants' motions for summary judgment. Summary judgment is appropriate only where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2014). In determining whether a genuine issue of material fact exists, we construe the pleadings, depositions, admissions, and affidavits strictly against the moving party and liberally in favor of the opponent. *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 49. A genuine issue of material fact exists "where the material facts are disputed or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts." *Id.* We review summary judgment rulings *de novo*. *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 13.

¶ 30          A. Direct Liability and Section 414 Liability Against CSL

¶ 31     First, Dudevoire argues that the trial court erred in entering summary judgment in favor of CSL on his claims that CSL retained control over all the contractors at the worksite and was directly negligent in its superintendence of the worksite. Dudevoire contends that CSL retained sufficient control over the contractors' work such that liability under section 414 of the Restatement (Second) of Torts should be imposed. Upon review, we find that CSL's mere presence and minor safety control did not amount to sufficient retained control over the contractors to

- 10 -

impose liability. Therefore, there is no genuine issue of fact as to whether CSL was directly negligent or negligent under section 414.

¶ 32    Generally, an employer of an independent contractor is not liable for the acts or omissions of the independent contractor. *Lee v. Six Flags Theme Parks, Inc.*, 2014 IL App (1st) 130771, ¶ 66. "This is because one who hires an independent contractor usually does not supervise the details of the contractor's work and is therefore not in a good position to prevent the contractor from acting negligently." *Madden v. Paschen*, 395 Ill. App. 3d 362, 381 (2009). Rather, "the party in control—the independent contractor—is the proper party to be charged with that responsibility and bear the risk." *LePretre v. Lend Lease (US) Construction, Inc.*, 2017 IL App (1st) 162320, ¶ 26. However, under section 414, an employer of an independent contractor may still be liable for an independent contractor's injuries if the employer retains "some control" over the independent contractor. *Id.* Section 414 states as follows:

> "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414 (1965).

Comment c to section 414 discusses when the rule applies to an employer:

> "In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its

progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414 cmt. c (1965); *Carney v. Union Pacific R.R. Co.*, 2016 IL 118984, ¶ 46.

¶ 33 Under section 414, an employer's "general right to enforce safety does not amount to retained control." *LePretre*, 2017 IL App (1st) 162320, ¶ 33. Further, the existence of a safety program, safety manual, or safety director is also insufficient to trigger liability under the section. *Madden*, 395 Ill. App. 3d at 382. Rather, under section 414, " '[t]here must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.' " *Id.* (quoting Restatement (Second) of Torts § 414, Comment c (1965)). "The best indicator of whether the defendant retained control sufficient to trigger the potential for liability under section 414 is the written agreement between the defendant and the contractor." *Carney*, 2016 IL 118984, ¶ 41. However, even if an agreement does not provide evidence of retained control by a defendant, evidence of an employer's conduct may demonstrate retained control. *LePretre, Inc.*, 2017 IL App (1st) 162320, ¶ 30. In light of this, we perform a two-pronged analysis. First, we determine whether the contractual agreement between CSL and McHugh evidences CSL's intent to retain control over McHugh's work sufficient to trigger the potential for liability. Second, we examine whether CSL's

conduct amounted to control over the methods of work or operative detail required to impose liability.

¶ 34    As to the first prong, we find that the contract did not evidence an intent that CSL would retain control over McHugh's work such that it should be liable. Section 3.3.1 of the contract provided that McHugh would "supervise and direct the Work, using [McHugh's] best skill and attention. [McHugh] shall be solely responsible for, and have control over, construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract." In addition to the exclusive control over the construction, section 3.3.3 of the contract provided that McHugh "shall be responsible for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent work."

¶ 35    With respect to the second prong, we find that CSL's conduct did not amount to control over the methods of work or the operative detail to impose liability. All witnesses consistently testified that CSL did not control the manner, method, or means of the contractors' work. In addition, the witnesses all agreed it was the duty of each contractor to oversee the safety of their own work. The right to monitor the safety of the worksite and power to stop work if safety violations were discovered is insufficient to trigger liability. As noted above, an employer's "general right to enforce safety does not amount to retained control." *LePretre*, 2017 IL App (1st) 162320, ¶ 33. CSL provided a required safety orientation and had onsite CSL employees to monitor safety violations. Those violations included minor hazards such as failing to wear a helmet on the site. As such, we find no genuine issue of fact as to whether CSL retained sufficient control over its contractors to be directly negligent or impose liability under section 414.

¶ 36    In reaching this conclusion, we reject Dudevoire's reliance on *Bokodi v. Foster Wheeler Robbins, Inc.*, 312 Ill. App. 3d 1051 (2000). We find *Bokodi* factually distinguishable. In *Bokodi*,

- 13 -

the court held that the general contractor (not the owner of the premises) exercised sufficient control over the work and safety standards at the worksite. In coming to that conclusion, the court relied on the following: (1) defendants' 29-point safety measures provision in its subcontract agreement; (2) defendants required the subcontractors to conduct weekly safety meetings monitored by defendants, (3) defendants provided guidelines to subcontractors for personal grooming, appropriate work clothes, appropriate personal safety equipment; (4) defendants instructed subcontractors when and where to erect barricades and warning lights; and (5) defendants employed a full time safety manager to conduct weekly safety meetings, walk through the worksite, and who was authorized to stop subcontractors' work for safety violations. *Id.* at 735.

¶ 37       By contrast, CSL only retained a general right to enforce safety guidelines with authority to stop work in the event of a safety hazard. In addition, CSL had the right to inspect the progress of the contractors' work and the right to prescribe alterations as to maintain the cleanliness and quality of the HVAC system. CSL's conduct did not amount to the same control exerted by defendants in *Bokodi*.

¶ 38       To the extent Dudevoire contends that CSL should be directly negligent for failing to exercise its supervisory control with reasonable care, we disagree. The employer's knowledge, actual or constructive, of the unsafe work methods or a dangerous condition is a precondition to direct liability. *Lee*, 2014 IL App (1st) 130771, ¶ 102. And, where the employer "has an insufficient opportunity to observe unsafe working conditions, then knowledge will not be inferred and direct liability will not ensue." *Calderon v. Residential Homes of America, Inc.*, 381 Ill. App. 3d 333, 347 (2008).

¶ 39 There is no evidence that the HVAC contractors were engaging in an unsafe practice of dropping the blue plastic on the floor. Nor is there any evidence of how long the HVAC contractors were engaging in such conduct. The only evidence of leaving blue plastic on the ground came from Dudevoire, who only observed the plastic the Friday before his incident. Dudevoire did not report the presence of the materials to any of the other contractors. CSL denied any knowledge of the hazard that caused Dudevoire's injury. There is also no evidence that CSL observed the hazard or was put on notice of the hazard. Although Dudevoire observed the materials the Friday before his accident, he admitted that the plastic was not on the concrete slab when he left the jobsite on Friday. He also did not know whether any CSL employee or contractor was present on the jobsite after he left the jobsite or over the extended weekend. In other words, the plastic could have been on the concrete slab for days or mere moments before his injury. There are simply no facts that support a finding that CSL had or should have had notice of the hazardous condition.

¶ 40 B. Direct Liability Section 414 Liability Against Mechanical

¶ 41 Dudevoire next argues that there is a genuine issue of fact as to Mechanical's negligence. Although Dudevoire frames his argument as a claim of direct negligence, Mechanical subcontracted the ductwork to M&M. Therefore, Dudevoire's theory of liability must be analyzed under section 414 liability. As we discussed above, CSL did not retain sufficient control over the contractors to impose liability. For the same reasons, we find that Mechanical did not retain sufficient control over its subcontractor (M&M) to warrant liability under section 414.

¶ 42 Here, Mechanical entered into a subcontract with M&M to perform the installation of the ductwork. The contract provided that M&M was responsible for its own work under the contract and that M&M would provide its own labor, materials, equipment, machinery, and services necessary to complete the stainless-steel work. In addition, Mechanical was not obligated to notify

- 15 -

M&M when to begin, cease or resume work, or to superintend M&M's work so as to relieve M&M of responsibility for any consequence of neglect or carelessness by M&M for whose acts and omissions M&M is responsible. Critically, the contract required M&M to ensure that any trash, debris, or liquid that poses a possible threat of safety shall be removed immediately. The contract made clear that M&M had the primary duty to take all reasonable safety precautions with respect to its work and comply with safety measures. Like CSL, Mechanical's general right of safety supervision is insufficient to establish that it retained control over M&M to impose liability under section 414.

¶ 43    Moreover, the conduct of the parties in carrying out the provisions of the Mechanical and M&M subcontract establishes that M&M would be responsible for the supervision and safety of the ductwork. Huenefeld (Mechanical's project manager) testified that all the ductwork was subcontracted to M&M and Mechanical did not perform any of the ductwork at the project. Huenefeld explicitly stated that Mechanical did not have any control over the means and methods of M&M's work. While Mechanical oversaw M&M's work, Huenefeld did not have the general authority to tell M&M employees to stop work if he saw a safety hazard. If he did see a safety hazard, he contacted M&M's project manager.

¶ 44    Hults (the owner of M&M) testified that Mechanical had subcontracted the ductwork to M&M. According to Hults, Mechanical would observe M&M's work to see its progress. However, Mechanical did not inspect M&M's day-to-day work for purpose of ensuring project safety. Similarly, Daniels (McHugh's superintendent for the project) testified that when Mechanical subcontracted the work to M&M, it was understood that Mechanical was not responsible for the means, manner, or methods of M&M's work. Given this evidence, we find the trial court properly found that Mechanical did not retain sufficient control over M&M employees to warrant liability

under section 414. Because the evidence here fails to indicate sufficient control by Mechanical over M&M's work under the retained control exception of section 414, Dudevoire fails to raise a factual question necessary to survive summary judgment.

¶ 45 In reaching this conclusion, we reject Dudevoire's argument that the contract between McHugh and Mechanical establishes that Mechanical should be directly liable for M&M's housekeeping practices. To support this argument, Dudevoire notes that the contract between McHugh and Mechanical required Mechanical to abide by the contract between CSL and McHugh to ensure that it provided its own labor and material and take responsibility for the safety of its own work. However, the contract between Mechanical and McHugh permitted Mechanical to subcontract with others to complete the ductwork. Mechanical subcontracted the entire ductwork project to M&M and delegated the duties of the installation and safety to M&M. See *Oshana v. FCL Builders, Inc*., 2012 IL App (1st) 101628, ¶¶ 33-34.

¶ 46 We also reject Dudevoire's argument that there is a genuine issue of material fact as to whether a Mechanical employee created the hazard by personally placing the plastic on the concrete step. Dudevoire notes his own testimony that he saw Mechanical employees using blue plastic on the ductwork on the jobsite. Dudevoire had also observed HVAC workers dropping plastic on the floor in the basement. The flaw in Dudevoire's argument is that it is purely speculative. Dudevoire could not identify a specific person he saw dropping the plastic on the floor. At best, he guessed that an HVAC contractor placed the blue plastic on the ground because the HVAC workers were the only individuals using the similar type of plastic. However, he could not say specifically whether Mechanical or M&M workers were the ones using the plastic on the jobsite. "Although a plaintiff is not required to prove his case at the summary judgment stage, in order to survive a motion for summary judgment, the nonmoving party must present a factual basis

- 17 -

that would arguably entitle the party to a judgment." *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002). "Mere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999).

¶ 47    Similarly, we reject Dudevoire's contention that Mechanical was directly negligent in its supervision of M&M employees conduct on the jobsite. As we discussed above regarding CSL (*supra* ¶ 39), there is no evidence that Mechanical had or should have had any notice of the hazardous condition. Therefore, there can be no direct liability for failing to exercise supervision over the M&M employees.

¶ 48                               C. Premises Liability against CSL

¶ 49    Dudevoire also argues the trial court erred in granting summary judgment on his premises liability claim against CSL. According to Dudevoire, there is a genuine issue of fact as to whether the hazardous condition was created by CSL's employee's negligence. Generally, to impose premises liability on a landowner, plaintiff must show that the owner had some notice of the dangerous condition. Restatement (Second) of Torts § 343. However, a plaintiff does not need to prove actual or constructive notice when he can show the substance was placed on the premises through the defendant's negligence. *Reed v. Wal-Mart Stores, Inc.*, 298 Ill. App. 3d 712, 715 (1998) (citing *Wind v. Hy-Vee Food Stores, Inc.*, 272 Ill. App. 3d 149, 155 (1995); *Donoho v. O'Connell's, Inc.*, 13 Ill. 2d 113, 122 (1958). To hold CSL liable under this theory, Dudevoire needed to show: (1) the blue plastic bag was placed on the premises by CSL though CSL's own negligence and (2) the blue plastic bag was related to CSL's business.

¶ 50    Here, there is no evidence that CSL caused the blue plastic to be placed on the concrete step. CSL did not install the blue plastic covering to the uncovered ductwork of the HVAC system. CSL told the contractors that the ductwork needed to be covered to prevent construction work or

- 18 -

debris from getting into the ductwork before it was installed to prevent the HVAC system from clogging at the time of startup. CSL employees were not involved in placing the blue plastic cover on the premises or on the ductwork. Indeed, the October 18, 2012, e-mail from the subcontractor to CSL engineer Richards showed that Hults acknowledged his previous commitment to CSL to provide covering for the ductwork openings onsite but would request his supplier to apply the plastic film on all future duct orders because it was "not working as planned." In short, CSL was not involved in the choice of plastic covering, ordering of the plastic covering, or the application and installation of the plastic coverings for the ductwork.

¶ 51 Contrary to Dudevoire's argument, he cannot show that CSL actively required the HVAC subcontractor to use the specific type of covering that caused his injury. CSL's only involvement in the covering of the ductwork occurred when it requested that contractors make sure the ductwork was sealed. CSL did not require the contractors or subcontractors to use the specific type of plastic that caused Dudevoire's injury.

¶ 52 Further, the plastic used to cover the ductwork was not related to CSL's business as a biopharmaceutical company. CSL did not require its employees to follow a usual practice of covering open ductwork during construction in furtherance of its business, nor did CSL use such covering throughout its ordinary course of business. As such, there is no evidence that CSL acted negligently by placing the plastic covering on the premises and negligently caused the plastic covering to create a hazardous condition. Consequently, there is no issue of fact as to CSL's liability.

¶ 53                                     III. CONCLUSION

¶ 54 For the foregoing reasons, we affirm the judgment of the circuit court of Kankakee County.

¶ 55 Affirmed.